No. 28.—SEABORN C. BRYAN, plaintiff in error *vs.* HUGH WALTON, adm'r., &c., defendant

[1.] The appointment of a guardian of a free person of color, being a matter of record, cannot be proven by parol testimony.

[2.] Where a person has acted notoriously as a *public* officer, it is *prima facie* evidence of the official character which he assumes; and his commission need not be produced. The same rule does not apply to a *private trust.*

[3.] Where one represents himself to act as the guardian of another, and induces others to contract with him in that capacity, he is thereby estopped from denying to the prejudice of such persons, that he is what he claimed to be.

[4.] But where the rights of others are concerned, the best evidence of which the nature of the case is susceptible, must be produced.

[5.] Before a notice, under the 57th Common Law Rule, can be made avail-

Seaborn C. Bryan *vs.* Hugh Walton.

able, the party giving it, or his agent, must previously make oath, (or his attorney state in his place) that the deponent or attorney, has reason to believe that the paper required to be produced, has been in existence— that it is in the possession, power or control of the person notified, and that it is material to the issue.

[6.] Before secondary evidence is admissible, as to the contents of a writing, all the sources of information must be exhausted, which are accessible to the party in search for the paper.

[7.] A will cannot be read in evidence to the jury as conveying title to personal property, in a Court of Common Law, until it has passed to probate before the Ordinary.

[8.] If a paper is sought to be introduced as an ancient document, the paper itself must be produced to establish its age, and the presumption arising therefrom of its proper execution and probate.

[9.] When a will, which is relied on as conveying title to personal property, is lost or destroyed, the proper course to be pursued is to establish the instrument, either at Common Law under our judiciary act, or by a pro- ceeding in Chancery; and then go before the Ordinary and have the copy thus established in lieu of the original, proven and admitted to record.

[10.] The rule, that in order to impeach a witness by proof of contradictory statements, the foundation must first be laid, by asking the witness whether or not he has made the declarations, intended to be proved, does not apply when the evidence to impeach the witness, is his sworn deposi- tions previously taken in the same cause.

[11.] Where administration has been granted by the Ordinary, the order conferring the appointment, cannot be collaterally impeached; but it will be presumed, that the judgment of the Ordinary was regular and proper.

[12.] If one, under a legal disability to dispose of his property, give it away to another, who sells to a third person, without notice of the incapacity of the donor, the ignorance of the vendee will not protect his title.

[13.] A free person of color in Georgia, cannot dispose of slaves, directly by deed of gift.

[14.] A free negro in this State, has no civil, social, or political rights, except such as are conferred on him by Statute.

[15.] The mere act of manumission, confers no other right, but that of freedom from the dominion of the master,' or exemption from involuntary service. It does not confer *citizenship,* nor any of the privileges incident to citizen- ship.

[16.] No analogy between slavery in this country and villenage; the former resembles, in many of its features the slavery of the Civil Law.

[17.] The etymological meaning of manumission.

[18.] To adopt a new member into the body politic, is an act of sovereignty, just as much as naturalizing a foreign subject.

[19] This State, when a Province, was settled by a community of free white

Seaborn C. Bryan *vs.* Hugh Walton.

citizens. The blacks were subsequently introduced as slaves; to whom parity of rank and privilege has never been accorded.

[20.] The *free person* of *color*, is associated with the *slave* in this State, in most of the humiliating incidents of his degradation.

[21.] The analogy between an infant and a free person of color fails in this, that at maturity the former can affirm or disannul his contracts, which are, therefore, *voidable* only; whereas the wardship or pupilage of the free person of color, and the disability consequent thereon, is perpetual, and hence his contracts are absolutely void.

[22.] Slavery, as compared with the various schemes of emancipation—domestic and foreign considered.

Trover, in Houston Superior Court.    Tried before Judge POWERS, April Term, 1853.

This was an action brought by Hugh Walton, as administrator of Joseph Nunez, a free person of color, who died without descendants, to recover possession of certain negroes, now in possession of Seaborn C. Bryan; but charged to belong to the estate of said Nunez.

The following points arose upon the testimony in the case : The plaintiff having served defendant with notice to produce the will of James Nunez, the father of Joseph, under which he claimed title to the negroes of Joseph, the defendant objected to answering, unless the plaintiff would make affidavit, that he believed the paper to be, or to have been, in defendant's power, custody or control; which objection the Court overruled; upon which the defendant answered, disclaiming all knowledge of such a paper. The plaintiff then made affidavit, that he had applied to Bush, one of the executors of said will, and was informed that it was in the hands of Janet Reed; on applying to her he traced it into the hands of one George, a lawyer, formerly residing in Burke county, but who had removed to Florida and there died; and that he had inquired of the Ordinary of Burke county, where James Nunez died, and had made search in his office for the paper, but had been unable to find it. Upon this showing, he proposed to introduce parol evidence of the contents of the will, and offered the

interrogatories of Joseph Bush and Mary Rogers, which was objected to by defendant, on the following grounds, to wit:

1st. Because the loss of said paper had not been sufficiently acounted for, and no sufficient diligence had been shown in the search made for it.

2nd. Because there was no proof of the probate of the will, and it could not convey title to personal property without probate.

3rd. Because, although the paper purports to be over thirty years of age, it must itself be present to establish its presumed proper execution, and probate; and parol testimony of its contents and existence is inadmissable for such a purpose—which objections the Court overruled, and the interrogatories and answers were read. They testified that they knew Joseph Nunez; that he died in Burke county, where he resided, about January 1st, 1847; that he was a free person of color, and that Alexander M. Urquhart was his guradian at the time of his death, and had been for four or five years previously; that they knew the negro property in his possession, which they described; that the negro Nanny, the mother of the others, had belonged to James Nunez, the father of Joseph, who died in 1809, leaving a written will, of which Bush the witness, and one Alexander Telfair were executors; by which will Nanny and her increase, then without any, were left to Fanny Galphin, the sister of said James, during her life, and at her death to his son Joseph; that Fanny Galphin died in 1812, leaving a will, bequeathing said property to the said Joseph.

To that portion of this testimony which states that Urquhart was the guardian of Joseph Nunez, as well as to the contents of the wills of Joseph Nunez and Fanny Galphin, the defendant objected, on the ground that there was higher evidence; which objection was overruled by the Court.

The plaintiff having closed, the defendant introduced a deed of gift, of the negroes in dispute, made by Joseph Nunez to Alexander M. Urquhart, dated 20th December, 1846, and a bill of sale, from Urquhart to himself, dated February 18th, 1847. The defendant offered to read to the jury, the answers

of Joseph Bush to former interrogatories taken in this case, for the purpose of impeaching his testimony, by showing contradictions between them and his present answers; to which the Court said, you may read them as your evidence and take the consequence; and refused to permit them to be read, for the purpose proposed by defendant.

The testimony and argument being concluded, the defendant's counsel requested the Court to charge the jury:

1st. That if they believe from the evidence, that the relation of guardian and ward existed between Urquhart and Joseph Nunez, and that during that relation Nunez made a deed to Urquhart, the guardian for the property in dispute, such deed is not void, but voidable, and only then, if it is shown to be fraudulent.

2nd. That although they may believe the deed from Nunez to Urquhart is fraudulent, yet, if Seaborn C. Bryan purchased for value and without actual notice of the fraud, his title is valid.

3rd. The character of the consideration paid by Bryan, is all that the jury can take into consideration; with its adequacy they are not concerned; and it will be sufficient, if they are satisfied that Bryan paid a valuable consideration.

4th. That when one of two innocent parties must suffer in consequence of the fraud of a third person, the rule is, that that party putting it into the power of such person to commit the fraud, must be the sufferer.

5th. The fact that the deed from Nunez to Urquhart does not show that the relation of guardian and ward existed between the parties thereto, is a circumstance that repels any presumption of notice of that relation to Bryan, the purchaser, from Urquhart, and that this presumption of want of notice, upon Bryan's part is strengthened by the fact, that he lived at a considerable distance (if the jury shall believe this fact) from the residence of the said parties, to said deed.

6th. That a free person of color has a right, if he is over the age of twenty-one years, to convey his property.

7th. That in the action, the plaintiff must recover, if at all,

upon the strength of his own title, and cannot rely for a recovery upon the defects in the defendant's title; that the party in possession is favored in law, and can only be dispossessed by a paramount title.

8th. That if a perfect outstanding title has been shown, this will defeat the action of the plaintiff, and entitle the defendant to a verdict.

9th. That if they believe that Joseph Nunez died, leaving no child or children or representative of such child or children in the right line, then he died without a legal heir, and his property escheated to the State of Georgia, and the Escheator for the county where he died, should have brought this action; and the administrator having brought it, is not entitled to recover.

To these requests the Court charged as follows: To the

1st Request, the Court charged, that if the jury believe that the deed was made by Nunez, a free person of color, to his guardian, acting for him; and while he was in this capacity the deed was absolutely void, because the Statute of the State itself, made the deed of the free negro void, and all his acts, except they were done by his guardian and so signed, it was obvious, the guardian could not make a deed to himself. Besides the relation of free negro and guardian, was of a more dependent nature, than that of ordinary Trustee and *cestui que trust*, and a different rule prevailed. The decision of the Supreme Court was referred to, to show that a deed of this kind was voidable. That decision of the Supreme Court was adverse to a decision of the Supreme Court of U. S., and adverse to what I had believed to be the rule in England and most of the States; nevertheless, their decision was now the law of Georgia; but for the reason above stated, it was perfectly consistent with the ruling here. As to

2nd Request, the Court charged against it; the rule it sought to enforce was applicable to a class of cases, not like the one before the Court.

3rd. The Court charged the jury, that this was the Law, and if Bryan bought a good title, the inadequacy of the consid-

Seaborn C. Bryan *vs.* Hugh Walton.

cration was not material, except so gross as to amount to a fraud.

4th. The Court charged this undoubtedly to be the Law, in a proper case made, but if Nunez was incapable like a minor, to convey title, which the Court had decided he was, especially to his guardian, it was impossible to see how he could put it into the power of Urquhart to defraud defendant.

5th. The Court charged, that these matters of fact were for the jury. This, though being a case of title, if Nunez had a good and perfect title, which he had not impaired by his own act or in any other way, he must recover, notwithstanding the good faith and want of notice in Bryan. The doctrine applied to another class of cases.

6th. The Court decided he could, but alone by the intervention and by the act of his guardian and not otherwise.

7th. The Court gave these instructions in charge, as desired to the jury.

8th. The Court gave these instructions, as desired, and said, that if Nunez had not shown a good title in himself, they had nothing to do with the weakness of Bryan's title, and must find for defendant.

9th. The Court charged, that if the jury believed that an administrator of Nunez was regularly before the Court, by appointment, the question of a want of heirs, on the part of Nunez, could not come up in this collateral way; if his property escheated, when the escheator came forward he could be heard. In the opinion of the Court, this was not a defence that could avail defendant here, on this trial, and finally, (among other things not herein complained of,) the Court reminded the jury, that while they had the greatest latidude allowed them in passing on the facts, they were bound to receive and apply the Law as given in charge to them by the Court. That the remark he had made on the trial, that a jury who would disregard the instructions of the Court, in matters of Law, would commit perjury, might have been thought by them harsh and discourteous to them, the Court did not so

intend; but did now, in all courtesy, believe the remark in substance true.

Under this charge, the jury found for plaintiff; and counsel for defendant excepts to said charges, and refusals to charge, and to the said decisions of the Court as above stated.

GILES, WARREN & HUMPHRIES, MILLER & HALL, and R. P. HALL, for plaintiff in error.

KILLEN, for defendant.

*By the Court.*—LUMPKIN, J., delivering the opinion.

[1.] The first error complained of in the record, is the decision of the Court, admitting that portion of the testimony of Joseph Bush, which went to show that Alexander M. Urquhart was the guardian of Joseph Nunez, at the time of the donation by the latter to the former.

The appointment of a guardian for a free person of color, is necessarily a matter of record. It has to be done by the Judge of the Superior, or the Justices of the Inferior Courts, of the respective counties of this State, at a regular term of said Courts, and upon the written application of the free person of color, and consent, in writing, of the guardian. (*Cobb* 785.)

But it is argued, that inasmuch as Urquhart held himself out to the world as the guardian of Joseph Nunez, he is estopped from denying that he stood in this relationship to the donor.

[2.] We recognize the rule, originating in motives of public convenience, that where an individual has acted notoriously as a *public* officer, it is *prima facie* evidence of the official character which he assumes; and his commission or appointment need not be produced. (4 *T. R.* 366. 5 *B. & A.* 243. 6 *Peters.* 352, 367. 12 *Wheaton* 70. 1 *Brock.* 520.) Whether the same doctrine applies to an office which is *private*, as that of *trustee*, is questionable. (1 *Jac. & W.* 464, 468.)— The better opinion seems to be, that in such case, some proof

Seaborn C. Bryan *vs.* Hugh Walton.

would have to be offered, of the existence of the office, and of the appointment of the ostensible agent to it.

[3.] At any rate, in this case, the principle contended for, would apply only as between the person thus representing himself as guardian, and those who were thereby induced to contract with him as such. To all such, he would not be permitted to deny, to their prejudice, that he was what he claimed to be. If, for instance, Alexander M. Urquhart informed the witness, Mary Rogers, that he was the guardian of Joseph Nunez, as she swears he did, and she hired negroes, or entered into any other agreement with him in that character, he cannot afterwards repudiate the capacity in which he contracted, to the injury of Mrs. Rogers.

[4.] But when the object is to defeat the title of Seaborn C. Bryan, the best evidence of which the case, in its nature, is susceptible, must be produced. And it was error in the Court, to allow parol proof to supply the place of the stronger record testimony.

[5.] Hugh Walton, the administrator of Joseph Nunez, undertook to establish title to the negroes in dispute, from the will of James Nunez, the father of his intestate. The original will seems never to have been proven and admitted to record.— Walton served notice on Bryan, the defendant, to produce the will, under the 57th Common Law Rule of Practice, which was adopted to carry into effect the 6th Section of the Judiciary Act of 1799. (*General Index*, 592, '3.) Before a notice under this rule can be made available, the party giving it, or his agent, must previously make oath (or his attorney state in his place) that the deponent or attorney has reason to believe the paper required to be produced, has been in existence; that he believes it is in the possession, power or control of the person notified; and that it is material to the issue.

The plaintiff in this case, refused to make the preliminary affidavit required on his part, and which is imperatively required by the rule, to be filed in the Clerk's office, before the notice under it can be made available; and for the reason, that from the search he had made, he could not swear that he believed

the paper was in the possession of the opposite party: still the Court compelled the defendant to purge himself by oath, of the custody of the paper. This was manifestly erroneous.

The sufficiency of the notice itself, was objected to, but not insisted on in the argument; and hence, not commented upon in the decision.

[6.] The third assignment is, that the Court erred in allowing the testimony of Joseph Bush, as to the contents of the wills of Fanny Galphin and James Nunez. The objection to the evidence was three-fold: 1st. Because the original will had not been sufficiently accounted for; 2d. Because there was no proof of the probate of the will; and that without probate, it could not be received as evidence of title to personal property; 3d. Because, although the paper, whose contents were thus sought to be introduced, was represented to have been executed more than thirty years ago; still, it must itself be present, to establish, by inspection, its claim to antiquity; and thus create a presumption in favor of its proper execution and probate.

We think that each of these exceptions was well taken.

1. And first as to diligence. We hold that no sufficient search was made for these wills. The party did not, in the language of the Court, in previous cases, exhaust all the sources of information which were accessible to him. Saying nothing as to the will of Fanny Galphin, which is wholly immaterial in the present issue, what was the proof as to the inquiries set on foot to find the will of James Nunez? The plaintiff applied to Joseph Bush, said to be one of the executors nominated in the will, and was informed that the instrument was in the hands of Janet Redd. Upon application to her, it was traced to the possession of one George, a lawyer, who had resided at one time in Burke county, whence he had emigrated to to Florida, where he died. Besides this, inquiry had been made at the Ordinary's office, of Burke county, where James Nunez, the reputed testator had lived and died; and upon examination by the Clerk, no such paper could be found.

All this was very good, so far as it went. It appears, however, that one Alexander Telfair was appointed co-executor

with Joseph Bush under this will. Whether he was living or dead, the record does not disclose. He was as likely to have had the possession of this paper as Bush. And yet, no inquiry was instituted in that direction; either personally of him, if living; or of his legal representative, if dead. Neither was any search attempted among the papers of George, the attorney in whose custody the paper was last traced. The showing was defective in both of these particulars—certainly in the former, so as to let in secondary evidence of the contents of the will.

[7.] 2. The second objection is equally fatal, namely, that a will cannot be read in evidence to the jury, as conveying title to personal property in a Court of Common Law, until it has passed to probate before the Ordinary. (*Hester, executor, vs. Young,* 2 *Kelly,* 44.)

[8.] 3. And the third ground taken against the testimony attempted to be introduced, that the paper itself must be present, to establish its age; and the presumption arising therefrom, of its proper execution and probate, was virtually sustained by this Court, in the case of *Francis W. Jones and Wife vs. Charles W. Morgan,* recently decided at Americus, and not yet reported.

[9.] Where a will, which is relied on as conveying title to personal property, is lost or destroyed, the proper course to be pursued, is to establish the instrument, either at Common Law, under our Judiciary Act, or by a proceeding in Chancery, and then go before the Ordinary, and have the copy thus established in lieu of the original, proven and admitted to record.

The next assignment of error, is in admitting the testimony of Benjamin D. Hill. But this ground being abandoned on the argument, it becomes unnecessary to pass upon it.

[10.] The fifth assignment is, that the Court erred in refusing to allow the defendant to read the testimony of Joseph Bush, (taken at the instance of the plaintiff, and returned into Court) for the purpose of contradicting material statements by the same witness, in his depositions, taken by commission, and previously read by the plaintiff to the jury. We adhere to the

rule, that in order to impeach a witness, by proof of contradictory statements, the foundation must first be laid, by asking him whether or not he has made the declarations intended to be proved. But this does not apply, where the evidence to impeach the witness, is his sworn depositions, previously taken in the same cause. (*Williams et al. vs. Chapman,* 7 *Ga. Rep.* 467.)

It is true, that the Court offered to permit the defendant to read the answers of Joseph Bush: "Provided he would adopt the testimony of this witness as his own, and take the consequences." That is, that he should be bound by the statements of the witness, and not be allowed to gainsay them. But this would have been to entrap the party. He did not desire to rely on this witness for any purpose. On the contrary, his object was to impeach and destroy, if possible, his credit altogether. He believed his testimony to be entirely false. And this he sought to establish, by showing that he had, at different times, sworn to contradictory statements. He ought to have been allowed this privilege.

The next assignment of error, grows out of the refusal of the Court to charge, as requested, as well as to the charges as given. And, without going into detail, I would state, that this portion of the bill of exceptions, presents three questions only, which are necessary to be considered; and the

*First,* is as to the disability of the plaintiff to maintain this suit. If it be held that Joseph Nunez had no capacity to convey slaves, then it is insisted in behalf of the plaintiff in error, that the negroes in dispute are forfeited to the State—the record disclosing the fact that there are no lineal heirs of Joseph Nunez, who can take these negroes, by descent, under the Act of 1819; and that consequently, the right to recover this property, if in anybody, vests in the public escheator, and not in the administrator of the deceased.

[11.] The proper answer to this, is that administration has been granted by the proper Court, to the plaintiff in trover.— The order of the Court, confirming this appointment, cannot be attacked in this collateral way. If the escheator, or any one

else, having an interest in the matter, see fit to do so, application can be made to the Ordinary that granted the letters, to revoke them, upon the ground that there are neither debts nor descendants of Joseph Nunez, to authorise an administration. Until this is done, we must presume in favor of the regularity of the judgment of the Court, conferring this power.

[12.] *Secondly*, it is argued, that conceding Joseph Nunez as a free person of color, had no right to give or sell the slaves in dispute, still, Bryan, the defendant in the action, and purchaser under Urquhart, will be protected : provided he bought without notice of the defect in his vendor's title.

We cannot yield our assent to this proposition. These negroes were left in the possession of Joseph Nunez, at his death. They were seized by Urquhart, under his deed of gift, and sold to Bryan. The administrator of Nunez now sues to recover the negroes of Bryan. If the deed of gift from Joseph Nunez to Urquhart is void, for want of legal capacity in the donor to convey, how can the want of notice to Bryan constitute any defence against the legal title remaining in Nunez, up to the time of his death, and now asserted by Walton, his administrator ?

[13.] *Thirdly*, the last and main point in this case, remains to be discussed ; and it is this : Can a free person of color in Georgia, dispose of slaves by deed of gift ?

This is a grave question. It involves a great principle ; it establishes an important precedent ; it must be determined upon reason and argument ; it is without authority, so far as my researches have extended.

On this point, the Court and the counsel for the plaintiff in error, occupy positions as wide as the poles ·apart from each other. And one is entirely right, and the other altogether wrong ; for there is no half-way ground to stand upon. It is contended by the counsel of Mr. Bryan, that free persons of color in this State, are entitled to all the rights, and may exercise all the powers and privileges of free white citizens, unless restricted by Statute ; and that no law of the land having deprived this class of persons of the *jus disponendi*, that it

is attached necessarily, as an incident to the ownership or *jus tenendi.*

[14.] Whereas, we maintain, that the *status* of the African in Georgia, whether bond or free, is such that he has no civil, social or political rights or capacity, whatever, except such as are bestowed on him by Statute; that he can neither contract, nor be contracted with; that the free negro can act only by and through his guardian; that he is in a state of perpetual pupilage or wardship; and that this condition he can never change by his own volition. It can only be done by Legislation.

[15.] That the act of manumission confers no other right but that of freedom from the dominion of the master, and the limited liberty of locomotion; that it does not and cannot confer *citizenship*, nor any of the powers, civil or political, incident to *citizenship*; that the social and civil degradation, resulting from the taint of blood, adheres to the descendants of Ham in this country, like the poisoned tunic of Nessus; that nothing but an Act of the Assembly can purify, by the salt of its grace, the bitter fountain—the "*darkling sea.*"

I feel a strong inclination, I confess, to give my sentiments pretty fully upon this subject—to go beyond the usual limits of an opinion; and to speak in the style of argument rather than of authority. I am somewhat prepared to do so. And the novelty of the subject would seem to justify, if not to require it. It would not be unprofitable, I have thought, to sketch hastily the history of African slavery in this country, from its first introduction into the Colonies, at the commencement of the 17th century, down to the present period—to review summarily the laws of all the Southern States upon this subject—and notice the various modifications which they have undergone; keeping pace not only with the advancing civilization of the age, but with the improved condition of the negro himself. In this way, the present *status* of free persons of color, could the more clearly be ascertained and defined.

But who would commend me for this labor? Or rather, I might ask, who would not condemn me for this tax upon their

time and patience ?   In this age of amplification, when Presidential and Gubernatorial Messages, Congressional speeches, and all other public documents are measured by the ell instead of the inch, Judges are criticized and censured for not writing opinions with the brevity of " Coke's Reports in verse," where a whole case is compressed within the narrow compass of a couplet.

Thus admonished, I must forego the temptation, however strong and inviting; and resign the task to other and abler hands.

I would remark, that it will be found, on examination, that the condition of the African race is different in every slave state; and is less favorable in the extreme Southern, than in the more Northern slave States; and that consequently, whenever a question is made relative to a free person of color, we must have recourse mainly to our own local laws, to find a rule for our determination, and to such principles as are dictated by the peculiar genius of our people, and policy of our institutions.

[16.] I would further suggest, that any analogy drawn from the villenage of the feudal times, is utterly fallacious as to this investigation.   A villain, it is admitted, might acquire any kind of property, real or personal; and he might freely dispose thereof, unless prevented by the entry and seizure of the lord; he might sue all manner of actions against any other than his lord; in the capacity of executor, he might even sue his lord.   In a word, where his lord was not concerned, a villain was a freeman in all his dealings.   (*Litt. Ten. S.* 189, 190. *Hallam's View of the Middle Ages, vol. i.* 122, 124; *vol. ii.* 199.)

How different the circumstances of the villain, from the slave of the Southern States.   His *status* resembles much more strikingly the slavery of the Ancient Republics.   Their slaves, like ours, had no name, but what their masters gave them.— They could take nothing by purchase or descent; they could have no heirs; they could make no will or contract of any kind.   The fruits of their labor and industry belonged to their

masters. They could neither plead nor be impleaded; and were utterly excluded from all civil concerns. They were incapable of marriage. The laws of adultery did not apply to them. They might be sold or mortgaged. *Partus sequitur ventrem,* was the rule indiscriminately applied to slaves and cattle. (*Dr. Taylor's Elem. Civ. Law,* 429, *and the authorities there cited.*) And this was not only the civil law, but the law of the Jews, Phenicians, Carthagenians, Egyptians and Greeks, and all other nations, tongues and people. Also, *nostri servi sunt qui ex nostris anceillis nascuntur,* was the settled doctrine of the nations at that day. Such was the condition of *white* slaves in democratic Greece and republican Rome; and notwithstanding the disproportion in the former *free state,* as it is justly called, was in the ratio of 30,000 to 400,000.— Aristotle, the prince of logicians and philosophers, declared that the relation of master and *slave,* was just as indispensable in any well-ordered State, as that of husband and wife.

What has been stated, will suffice to show, that villenage differed extremely from the slavery of the civil law; and that our law of African slavery corresponds much more closely to the latter than the former; and that the effect of manumission, by the civil law, would have great influence in the determination of a similar question here, were it not for the difference *in color,* between their slaves and ours—a difference deep and ineradicable, extending more or less, not only to every portion of this country, but even to the continental nations. As yet, I believe, *free negroes* are not in *any* State in the Union, entitled to *all* the privileges and immunities of *citizens.* And marriages of whites with blacks, are not only generally prohibited in the United States, under ignominious penalties; but such connections in France and Germany, constitute but a degraded state of concubinage.

Anciently, in Rome, the manumission of a slave produced no change of state in him, " *Because he had no state or civil capacity.*" Servus autem manumissus capite non minuitur ; quia nullum caput habuit. (*Justinian Lib.* 1, *Tit.* 16, *p.* 43.) And such, in a word, we apprehend to be the exact result of African man-

Seaborn C. Bryan *vs.* Hugh Walton.

umission here; and for the very brief, but satisfactory reason assigned in this single sentence. It produces no change in the state of the *negro* slave here, because he has no state or civil capacity. This we believe to be the whole law of this case; and upon this simple principle, it may be safely rested. How can the mere act of manumission, by the master, invest the slave, who previously held no standing in the State, with any of the attributes of a freeman?

[17.] The etymologists say, that manumission is so called, because the master, holding the bondman's *hand*, said to the by-standers, *hunc hominem liberum esse volo,* &c.—I am willing this man should be free; and then discharge him out of his power and dominion, by emitting him out of his *hand.* Grant this definition, or derivation, to be correct, I ask, does this ceremony of bidding the slave go free, *remit* him to any civil rights or capacity? Must not these be conferred by a power higher than the master's; in other words by express Statute?

Cicero, in his *Topics,* reckons three modes of manumission; Tacitus two, and Justinian five. By the second of these, after the Prætor or Prætor's Lictor touched the slave with a wand or rod, premising a solemn form of words, which he thrice repeated, the master immediately took the bondman by the right hand, turned him round about and dismissed him; and the reason given for turning the person round about, was to show that he had the power of going wherever he pleased. (*Ayliffe's new Pandect of the Civil Law, p.* 90.)

[18.] Such is the result, and no more, of manumission here. The slave is dismissed from the dominion of his master; and clothed with the privilege of going where he pleases. But to become a citizen of the body politic, capable of contracting, of marrying, of voting, requires something more than the mere act of enfranchisement. To adopt into the body politic a new member, is a vastly important measure in every community.— It is an act of sovereignty, just as much as naturalizing a foreign subject. The highest act of sovereignty a government can perform, is to adopt a new member, with all the privileges and duties of citizenship. Was there a general law, elevating all

free persons of color to this condition, then the assent of the government would be given in advance of the Act of Manumission. No such act is claimed—none such exists. The black man in this State, may have the power of volition. He may go and come, without a domestic master to control his movements; but to be civilly and politically free, to be the peer and equal of the white man—to enjoy the offices, trusts and privileges our institutions confer on the white man, is not now, never has been, and never will be, the condition of this degraded race.

[19.] Our ancestors settled this State when a province, as a community of white men, professing the christian religion, and possessing an equality of rights and privileges. The blacks were introduced into it, as a race of Pagan slaves. The prejudice, if it can be called so, of caste, is unconquerable. It was so at the beginning. It has come down to our day. The suspicion of taint even, sinks the subject of it below the common level. Is it to be credited, that parity of rank would be allowed to such a race ? Let the question be answered by our Naturalization Laws, which do not apply to the *African*. He is not and cannot become a *citizen* under our Constitution and Laws. He resides among us, and yet is a stranger. A *native* even, and yet not a citizen. Though not a *slave*, yet is he not free. Protected by the law, yet enjoying none of the immunities of freedom. Though not in a condition of chattelhood, yet constantly exposed to it.

[20.] He is associated still with the slave in this State, in some of the most humiliating incidents of his degradation.— Like the *slave*, the *free* person of color is incompetent to testify against a free white citizen. He lives under, and is tried by the same Criminal Code. He has neither vote nor voice in forming the laws by which he is governed. He is not allowed to keep or carry fire-arms. He cannot preach or exhort without a special license, on pain of imprisonment, fine and corporeal punishment. He cannot be employed in mixing or vending drugs or medicines of any description. A white man is liable to a fine of five hundred dollars and imprisonment in the com-

mon jail, at the discretion of the Court, for teaching a *free* negro to read and write; and if one *free* negro teach another, he is punishable by fine and whipping, or fine or whipping, at the discretion of the Court.   To employ a free person of color to set up type in a printing office, or any other labor requiring a knowledge of reading or writing, subjects the offender to a fine not exceeding one hundred dollars.

I do not refer to these severe restrictions, for the purpose of condemning them.   They have my hearty and cordial approval. The great principle of self-preservation, demands, on the part of the white population, unceasing vigilance and firmness, as well as uniform kindness, justice and humanity.   Everything must be interdicted which is calculated to render the slave discontented with his condition, or which would tend to increase his capacity for mischief.   My object is to counteract the antagonistic position assumed by counsel, who assert the claim of a free negro to *give and sell;* in broader terms, to contract and be contracted with.   The argument is, that a negro is a man; and that when not held to involuntary service, that he is free; consequently that he is a *free* man; and if a freeman in the common acceptation of the term, then a freeman in every acceptation of it.   This pithy syllogism, comprises the whole chain of reasoning, however elaborated on the other side.   The fallacy of it is, its assumption that the manumission of the *negro*, which signifies nothing but exemption from involuntary service, implies necessarily, and imparts *ipso facto*, all the rights, privileges and immunities which are incident to freedom, among the free white inhabitants of this country.   And in this distinction I find myself fully sustained by the Roman Law. Their freemen were subdivided into *freeborn* (*ingenui*) and *freedmen* (*liberti* in relation to their patrons; and *libertini* with regard to their class.)   He who possessed his freedom, was, on that account, capable of all those rights which were founded on the *jus naturale* and *jus gentium:* but freedom alone did not confer a capacity for the *political* rights of Roman citizenship, or for the *private rights,* determined by the *jus civile; for it was necessary, in order to enjoy these rights, that the freeman*

*should also be a Roman citizen.* (*Compendium of Modern Civil Law, by Ferdinand MacKeldey—edited by Philip Ignatius Kaufmann.*)

The *dedititii* were one of the three-fold division of *freedmen*, by the civil law; but they did not thereby become *Roman citizens;* but their condition differed but little from slavery. (*Justinian Lib.* 1, *Tit. V. p.* 15.) And I mention this, in further confutation of the position, that the bare act of manumission carries with it the right of citizenship in this State, with all its privileges.

So of the ancient villains among the Saxons. The lord might acquit his own title; but no man could be made *free*, in a *civil* sense, without the act and consent of the whole body. (*Discourse on the Laws of England, by N. Bacon, from the MSS. notes of John Selden, page* 35.)

To my mind, the idea is absurd, that the mere act of manumission can invest with all the attributes of manhood in a free state, a being who had no head or name or title, in the State before; who was held, *pro nullis, pro mortuis,* and for some, yea many purposes, *pro quadrupedibus.*

But let us look for a moment to our own legislation, founded on our own peculiar policy, in order to fix the condition of a free negro in this State. And for the purposes of this discussion, I deem it unnecessary to go behind the Act of 1818. By that Act, free persons of color were prohibited from acquiring the title or use of any slaves; and all such slaves were deemed and held forfeited to the State. (*Cobb*, 993.) Doubts were entertained whether this act did not operate retrospectively, so as to divest free persons of color of the property held by them at the time of its passage. Consequently, the Legislature, the year ensuing, declared that " All property held by any free persons of color, at the time of the passing of the foregoing Statute, shall not be deemed or considered as forfeited; *but that the same shall remain in the owner, or in his or her descendants, after his or her death.* (*Cobb,* 995.)

It is by this grant, that the slaves in controversy are held.— The General Assembly, in effect, provide, that under the Act

of 1818, James Nunez, the father of Joseph Nunez, should not be divested of the title to the slaves which he thus held; but that the property should *remain* with *him*, during his lifetime, and at his death, *go to his descendants*. It is by virtue of this section of the Act of 1819, and not under the will of his ancestor, that Joseph Nunez held these slaves. But this Act will be analyzed in vain, for authority in either father or son, to give these negroes by will or deed.

By the Act of 1833, contracts made with free persons of color, even for necessaries, are rendered void, unless made upon the written order of their guardian. (*Cobb*, 1005.) Can it be supposed that the Legislature would accord to this class the higher and more important privilege of giving or selling slaves, without the intervention of their guardian?

[21.] But it is attempted to analogize this case to the contracts of infants, which it is insisted that the infant may confirm and give binding force to, after he comes of age. The parallel fails in this. At twenty-one, the legal disability attaching to infancy, terminates. The minor is then a man.— But the pupilage in the other case is perpetual. The acts of an infant are *voidable* only, because at maturity, he may affirm or disaffirm them. The acts of a free person of color are *void*, because he never ceases to be a ward, though he attain to the age of Methuselah. His legal existence is forever merged in that of his guardian.

But I deem it useless to pursue this investigation further.

[22.] This judgment is pronounced in view of a few facts, to which I will barely advert, in conclusion.

In no part of this country, whether North or South, East or West, does the free negro stand erect and on a platform of equality with the white man. He does, and must necessarily feel this degradation. To him there is but little in prospect, but a life of poverty, of depression, of ignorance, and of decay. He lives amongst us without motive and without hope. His fancied freedom is all a delusion. All practical men must admit, that the slave who receives the care and protection of a

tolerable master, is superior in comfort to the free negro.   Generally, society suffers, and the negro suffers by manumission.   I am fully persuaded that the State ought sternly to withhold its assent to domestic emancipation ; and that the true policy, is not to seek to elevate the black man in our midst, to a condition of equality which it is impossible for him to exercise wisely for himself or the community.   Civil freedom among the whites, he can never enjoy.   To this isolated class, it will ever be but a name.

We doubt the propriety of ejecting our free negroes upon the free States.   They will not only become troublesome allies in the unconstitutional and unholy work of inveigling off our slaves, and assisting them to escape ; but their constant effort and aim will be to create discontent among our slaves ; and in case of intestine war, which may Heaven in its mercy avert, such a population would be in a situation to do us much mischief.

Whether the scheme of African colonization be feasible or not, the ablest and most discriminating minds have doubted.— There yet stands on our Statute Book, a resolution of the representatives of the people, in favor of this colonial enterprise, as presenting to the philanthropist, the citizen and the statesman, the only means, not only of benefitting the nominally free who are scattered over the land, but everywhere treated as an inferior race ; but as affording an outlet to the humane feelings of the benevolent, as well as a drain for that relative increase of the slave over the white population of this country, and which in some sixty years, has swelled to between 350 and 400 thousand.   Of one thing I am quite certain, and that is, that whether freedom will, in Africa, be a *reality* to the colored man and his children or not, in the United States, whether slaveholding or non-slaveholding, it is worse than slavery itself. And that the Courts of this country should never lean to that construction, which puts the thriftless African upon a footing of civil or political equality with a white population which are characterized by a degree of energy and skill, unknown to any th er people or period.   Such alone, can be *citizens* in this

great and growing Republic, which extends already from the Atlantic to the Pacific, and from the St. Lawrence to the Rio Grande.