## 35.   WOLFE *v.* GEORGIA RAILWAY & ELECTRIC CO.

1. (*a*)  A common carrier is responsible for the proper treatment of its passengers, and is bound to protect them from insult as well as from physical injury. Where the insult · is offered by one of the carrier's servants, the duty of protection is even stronger and more binding than where the offending party is a fellow-passenger; and for humiliation or wounded feelings, caused by such insult, a passenger is entitled to recover.

(*b*)  It is immaterial whether the insult .is caused by malice or is the result of negligence on the part of the carrier's servant. Injury caused by omission to protect is none the less actionable than that caused by commission.

2. (*a*)  In enforcing Penal Code, §527, requiring the separation of races, the conductor is still the agent and servant of the corporation, and the liability of the corporation for his acts as such is not diminished by the delegation of police power. The police power is granted to better enable the corporation to discharge its duty of protecting its passengers, but the burden of exercising extraordinary diligence in the protection of the passenger is not lightened. (By HILL, C. J., and POWELL, J.: If an honest mistake be made after extraordinary diligence has been exercised, the carrier would not be liable.)

(*b*)  Good faith unaccompanied by freedom from fault (that degree of freedom from fault recognized by law as applicable between carrier and passenger) is no excuse for an insult offered by a servant of the carrier

to a passenger who suffers injury; the good faith of the transaction can only be considered in mitigation of the damages.

3. (*a*) To call a white man a negro or to intimate that a white man is of African descent, under certain circumstances, may be an insult, and, dependent upon the circumstances, may be actionable.

(*b*) An insult does not necessarily consist in the use of language imputing a crime. It more generally consists in the use of language affecting the social status and personal feelings or the business relations of the person insulted.

(*c*) The courts can take judicial notice of social status and of the superiority and inferiority of races, without affecting the civil rights of the citizen. An existent fact, which is per se the subject neither of legislation nor of adjudication, can be judicially known and recognized as a fact.

Action for damages, from city court of Atlanta—Judge Reid. May 10, 1906.

Argued January 14,—Decided October 3, 1907.

*Dorsey, Brewster, Howell & McDaniel,* for plaintiff.

*Rosser & Brandon, Walter T. Colquitt,* for defendant.

RUSSELL, J.   Nathan F. Wolfe, the plaintiff, brought a suit for damages against the Georgia Railway & Electric Company. The defendant filed a general demurrer on the ground that no cause of action was alleged, and the court below sustained it. This judgment is brought to this court for review; and the question to be determined is, does the plaintiff's petition set out a cause of action?   The plaintiff alleged, that on Monday night, June 27, 1904, he, accompanied by his sister, boarded a car of the defendant at the corner of Garnett and Whitehall streets for the purpose of being transported to a point on Highland avenue, reached by one of the lines of defendant; that he paid to the conductor on the car the fare charged for the transportation of himself and sister, and asked for and received transfers to the Houston street car; that he was duly transferred to this car, which had two long seats, one on each side of the car, with a broad aisle between; that he and his sister entered the car from the rear, and walked forward and took seats in the front part of the car; that there is a regulation of the defendant company that white passengers will "seat from the front," and negro passengers will "seat from the rear" of the car; that when he and his sister had seated themselves, the conductor of said car came to him and took up the transfers for himself and sister, and at the

same time the conductor remarked to the petitioner, "You can not sit there;" that petitioner arose, thinking there was something the matter with the seat, and asked the conductor, "Where do you wish me to sit?" The conductor thereupon replied, "You must sit upon the rear portion of the car." Petitioner responded, "Where?" To which the. conductor replied, "Beyond the white gentleman." Petitioner thereupon responded, "Why do you wish me to sit there?" Whereupon the conductor replied, "It is all right; sit down there," indicating a space between the last white man and a negro. Whereupon the petitioner and his sister both asked, "What is this for?" The conductor replied, "Because white people seat from the front and negroes from the rear of the car." Petitioner asked, "What has that to do with me?" And the conductor responded, "Haven't I seen you in colored company?" Petitioner's sister then addressed the conductor as follows: "Do we look like colored people?" And petitioner, for the first time understanding the import of the conductor's language, demanded an explanation and apology. Whereupon the conductor stated that he might be mistaken, but that he thought he had seen the petitioner with some colored people. This colloquy took place in the car in the presence of all the passengers, and in a sufficiently loud tone to be heard all over the car. The petitioner further alleges negligence on the part of the company, and sets out grounds under which he claims a right of recovery.

The allegations in this case present to this court circumstances which have never heretofore been presented to the courts of this State, and in an extended search for authorities we have been unable to find a ruling by any court of last resort which deals with the main question involved in this case. The central point in this case, the pivot on which the decision must turn, is, whether it is insulting to publicly call a white man a negro. Two other questions, it is true, are presented in the record; but they are only incidental to the main question, which we have stated above. The two other issues relate to the liability of a carrier for insulting conduct towards its passengers on the part of its agents or servants, and involve a consideration of Penal Code, § 527, as affecting the liability of the carrier for the acts of its servants while exercising police power. There are therefore three questions in the

case: (1) Is the defendant street-car company liable for insulting conduct on the part of its servants? (2) In the enforcement of Penal Code, §527, is the conductor an officer of the State in any such sense as to relieve the corporation from liability for the malperformance of his acts while exercising police power? (3) Is the language alleged to have been used by the conductor, reasonably construed, necessarily insulting or so probably insulting and humiliating when publicly used as that the question as to whether it caused pain, humiliation, and disgrace should have been left to the jury?

1. There is no difficulty whatever in answering the first question. It is the duty of a common carrier to protect his passengers from insult, so long as they are passengers, not only from insult by fellow-passengers, but from insult at the hands of the carrier's own agents. The principle is clearly laid down in our own State in the decision in *Cole* v. *Atlanta & West Point R. Co.,* 102 *Ga.* 474, and cases therein cited; and the court quotes with approval from *Goddard* v. *Grand Trunk Ry.,* 57 Me. 214. See also *Savannah Railway Co.* v. *Quo,* 103 *Ga.* 125; and *A. & W. P. R. Co.* v. *Condor,* 75 *Ga.* 51. A carrier is as much bound to protect and shield from attack the passenger's feelings as his person; and if it subjects him to the pain and humiliation of being insulted or abused, it is liable for this negligent omission on the part of its servants to perform towards the passenger the duty of protection imposed by law; and it is immaterial whether the injury be wilful and wanton, whether it be intended or unintentional. From numerous authorities which we have examined, the following abundantly sustain the statement we have just made. Hutchinson on Carriers, §§595, 596; Thompson on Negligence, §3186; San Antonio Traction Co. v. Crawford, Tex. Civ. App., 71 S. W. 306; Texas Ry. Co. v. Tarkington, Tex. Civ. App., 66 S. W. 137; Booth on Street Railways, §372; 2 Sedgwick on Damages, 637. In Chamberlain v. Chandler, 3 Mason, 242, Judge Story, delivering the opinion, in discussing the duties, relations, and responsibilities which arise between the carrier and passenger, said: "In respect to passengers, the case of the master is one of peculiar responsibility and delicacy. Their contract with him is not for mere special·room and personal existence. . . It is a stipulation not for toleration merely, but for respectful treat-

ment; for that decency of demeanor which constitutes the charm of social life; for that attention which mitigates evils without reluctance and that promptitude which administers aid to distress. . . It is intimated that all these acts, though wrong in morals, are yet acts which the law does not punish; that if the person is untouched, if the acts do not amount to an insult and battery, they are not to be redressed; that the law looks on them as unworthy of its cognizance. The master is at liberty to inflict the most severe mental sufferings in the most tyrannical manner; and yet if he withholds a blow, the victim may be crushed by his unkindness. He commits nothing within the reach of civil jurisprudence. My opinion is that the law involves no such absurdity."

2. Upon the second proposition it is insisted by learned counsel for defendant in error that the street-railway company is not responsible or liable even if insulting language were used, because the act of 1891 (Acts 1890-1, p. 157) makes the conductor an officer of the State by delegating to him police power. This brings us clearly up to the question as to whether the conductor, in obeying §§ 526 and 527, or ever in exercising police power, is an officer of the State in such sense as to give immunity to his employee, the common carrier, from liability for damage arising from the improper discharge of his duties. The exact question, so far as Penal Code, § 527, is concerned, has not been decided by the Supreme Court, for § 902 of the Penal Code, which was involved in the decision in *Seaboard Air-Line Ry.* v. *O'Quin,* 124 *Ga.* 359, expressly provides that nothing therein contained shall affect the liability of the railroad company for the acts of its employees. We think that the omission of this provision from § 527, however, is immaterial. The reasonableness of the rule that agents, selected and discharged at the pleasure of the carrier, should not be the means of relieving it from proper liability, is apparent; and this court held in *Georgia Ry. Co.* v. *Baker,* 1 *Ga. App.* 833 (6) that "while a conductor of a common carrier is clothed with police power, that fact affords no immunity to the carrier for damages resulting from his wrongful and illegal discharge of his duties, either as a servant of the company or under cover of police power delegated to him by law." In no case where a passenger is mistreated can the fact that the servant of the company was carrying out the provisions of Penal Code be used as a defense, unless it

appears that such servant was acting outside the scope of his authority. The conductor acts at the peril of his employer. The police power, the duty of executing the law requiring the separating of the races, is not placed upon the conductor as an individual, but upon a particular agent of the company to enable the carrier to better perform its duty of protecting its passengers—of protecting them not only from assault and physical injuries, but also from abuse and insult. The particular officer of the company who shall discharge this duty is selected and named only because the artificial body has no hands save those of its servants. Nor does good faith affect the primal question of liability, though proof of good faith may reduce the finding to one for mere nominal damages. Good faith, unaccompanied by that degree of freedom from fault recognized by law as applicable between servant and passenger, is no excuse for an insult offered by a servant of the carrier to a passenger who suffers injury.

3. We come then to the third question of the case. If the language used was such as tended to cause pain and suffering by reason of humiliation and personal indignity offered by the company's servant, it would be immaterial whether he was acting as a police officer or not, and it would be immaterial whether the insult consisted of the commission of an overt act, wantonly and wilfully done, or such an act done as would naturally cause pain thereby, whether intended or not. Either would constitute an omission of the duty to protect the passenger resting upon the carrier. We think the jury should have been allowed to pass upon the circumstances under which the language was used and the manner of its use, and to say how much the plaintiff was damaged, if he was injured. The question has never heretofore been directly raised in this State as to whether it is an insult to seriously call a white man a negro, or to intimate that a person apparently white is of African descent. We have no hesitation, however, after the most mature consideration of every phase of the question, in declaring our deliberate judgment to be that the wilful assertion or intimation embodied in the declaration now before us constitutes an actionable wrong. We can not shut our eyes to the facts of which courts are bound to take judicial notice. Certainly every court is presumed to know the habits of the people among which it is held, and their characteristics, as well as to know leading his-

torical events and the law of the land. To recognize inequality
as to the civil or political rights belonging to any citizen or class
of citizens, or to attempt to fix the social status of any citizen,
either by legislation or by judicial decisions, is repugnant to every
principle underlying our republican form of government. Noth-
ing is further from our purpose. Under our benign institution,
"every man is the architect of his own fortune;" every citizen,
white and black, may gain, in every field of endeavor, the recogni-
tion his associates may award. That is his right and his own con-
cern. But the courts can take notice of the architecture without
intermeddling with the building of the structure. It is a matter
of common knowledge, that, viewed from a social standpoint, the
negro race is in mind and morals inferior to the Caucasian. The
record of each from the dawn of historic time denies equality.
This fact was recognized by two of the leaders on opposite sides
of the question of slavery, Abraham Lincoln and Alexander H.
Stephens. The former on numerous occasions declared that it
was no part of the proposition even of the abolitionists to attempt
to establish a condition of social equality between an inferior
and superior race. And Alexander H. Stephens declared that
the Southern Confederacy was based upon the acknowledged su-
periority of the Caucasian race over the Negro. The distinction
and inequality are recognized in Holy Writ.

We are not compelled to plant our decision on the ground of in-
equality or inferiority. We take judicial notice of an intrinsic
difference between the two races. Certainly if a court can take
judicial notice of near a thousand things, some even of slight
importance, which have been judicially recognized without proof,
this court may be presumed to observe that there is a marked
difference between a Caucasian and an African. Notice of this
difference does not imply legal discrimination against either, and
for that reason can not in any sense impugn or oppose the 14th
and 15th amendments to the constitution of the United States or
the constitution of our own State. Our constitution, article
1, section 1, paragraph 18, declares that the social status of the
citizen shall never be the subject-matter of *legislation*. It has
been said that this language was used for the express purpose
of leaving the social status open to judicial determination. We,
however, shall not take any such fanciful position; for it can

not properly be said that that which can not be the subject-matter of legislation can be judicially administered. This, however, does not affect the subject of judicial notice of matters of history, common knowledge, etc. The sounder view is, that neither legislatures nor courts shall grade the citizen according to his social status, and yet that the courts can and must know and notice the meaning of words of opprobrium as well as the connection in which these words are used. For instance, shortly after the Revolution no greater term of opprobrium could be applied to an American citizen than that of a Hessian or a tory, while of course it would have been no insult to apply the term Hessian to a native of the duchy of Hesse, and the word "tory" was deemed in old England a synonym of loyalty and patriotism. We might greatly lengthen the list by adding various terms, such as "carpet-bagger," "scalawag," etc., where words ordinarily innocent may be insulting—dependent upon the circumstances of their use. An insult or a slander may consist in the imputing of crime. But an insult does not necessarily consist in the use of language imputing a crime. It more generally consists in the use of language affecting the social status and personal feelings or business relations of the person insulted. Courts and juries are bound to notice the intrinsic difference between whites and blacks and the mixture of whites and blacks in this country. As said by Chief Justice Lumpkin, in *Bryan* v. *Walton,* 14 *Ga.* 200, "the effect of manumission . . would have great influence in the determination of a similar question here, were it not for the difference *in color,* . . a difference deep and ineradicable." The difference in races to which we have adverted is recognized in this State by the laws against intermarriage, by the laws for the separation of passengers by common carriers, separate schools, etc. It is admitted by the Supreme Court of the United States in Plessy *v.* Ferguson, 163 U. S. 544, where the constitutionality of a similar statute separating the races was upheld. On page 551, supra, the court says: "Legislation is powerless to eradicate racial instincts or to abolish distinctions based upon physical differences, and the attempt to do so can only result in accentuating the difficulties of the present situation. If the civil and political rights of both races be equal, one can not be inferior to the other, civilly or politically. If one race be inferior to the other socially, the consti-

tution of the United States can not put them upon the same plane." The same recognition of the great fact of distinction and difference between races is also accorded by the Supreme Court of Pennsylvania in the very forceful opinion in the case of West Chester & Philadelphia R. Co. v. Miles, 55 Pa. St. 209, 93 Am, Dec. 744. See also State v. Gibson, 36 Ind. 389.

Taking into consideration, then, the difference in color, if nothing else, and bearing in mind that a little more than forty years ago the black race were slaves without civil standing or social or political rights, and keeping in view the further fact that a pure black man can not be mistaken for a white man, and the fact that intermarriage between the races has been continuously forbidden in this State, to charge a white man, even though of dark skin, with being a colored man, or a colored man, even though of fair skin, with being a white man, is to impute the odium of illegitimacy. Under the decisions of this State it can not be questioned that to make such a charge (either directly, or by intimation easily understood by the bystanders) would be an aggravated insult; and if a servant, charged with the duty of separating the passengers, heedlessly, even though unintentionally, without the exercise of the proper degree of diligence, made a mistake, the company would be liable for his omission of that proper care for the protection of the passenger for which the carrier is bound. Furthermore, the Penal Code, §528, makes any passenger remaining in any car or compartment or seat other than that to which he may have been assigned guilty of a misdemeanor; and where the assignment and seats are well known, to falsely charge a passenger with occupying a seat not assigned to his race is to charge him either with attempting to commit a misdemeanor or of being actually guilty thereof. In any view this would be actionable. If the difference in race, referred to by Chief Justice Brown in *Scott* v. *State,* 39 *Ga.* 323, exists, as it undeniably does, then to wrongfully, though unintentionally, accuse a white man of being of negro descent and of trying to put himself in that portion of the car where by law he is forbidden, thus illegally causing mortification and pain, creates an injury for which the law allows reparation. The good faith of the conductor, his lack of intention to wound, may lessen and greatly mitigate the amount of the damages, but it can not altogether defeat a recovery; and

for this reason we think the court erred in sustaining the general demurrer and dismissing the case. In the case above cited, Chief Justice Brown, delivering the opinion of the court, says: "The Code of Georgia, as adopted by the new constitution, . . forever prohibits the marriage relation between the two races, and declares all such marriages null and void. With the policy of this law we have nothing to do. It is our duty to declare what the law is, not to make the law. For myself, however, I do not hesitate to say that it was dictated by wise statesmanship, and has a broad and solid foundation in enlightened policy, sustained by sound reason and common sense. The amalgamation of the races is not only unnatural, but is also productive of deplorable results. Our daily observation shows us that the offspring of these unnatural connections are generally sickly and effeminate, and that they are inferior in physical development and strength to the full-blood of either race. It is sometimes urged that such marriages should be encouraged, for the purpose of elevating the inferior race . . to the position of the superior; but they bring down the superior to that of the inferior. They are productive of evil, and evil only, without any corresponding good. . . But government has no power to regulate social status. Before the laws, the Code of Georgia makes all citizens equal without regard to race or color. But it does not create, nor does any law of any State attempt to enforce, moral or social equality between different races or citizens of the State. Such equality does not in fact exist, and never can. The God of nature made it otherwise, and no human law can produce it and no tribunal can enforce it. . . While the great mass of the conquering people of the States which adhered to the Union during the late civil strife have claimed the right to dictate the terms of settlement, and have maintained in power those who demand that the people of the States lately in rebellion shall accord to the colored race equality of civil rights, . . they have neither required of us the practice of miscegenation, nor have they claimed for the colored race social equality with the white race. The fortunes of war have compelled us to yield to the freedmen the legal rights above mentioned, but we have never authorized or legalized the marriage relation between the races, nor have we enacted laws . . regulating the social status, so as to compel our people to meet the colored race on terms of social

equality. Such a state of things could never be desired by the thoughtful and reflecting portion of either race. It could never promote peace, quiet, or social order in any State or community. No such laws are of force in any of the Northern States, so far as I know; and it is supposed no considerable part of the people of any State desire to see them enacted."

We can not shut our eyes to the fact that there is a universally recognized distinction between the races. The situation which confronts us in the present case is the relation occupied by three classes of people in this State: whites, blacks, and a mixed breed resulting from unlawful relations between the two. The charge made by the conduct of the street-car conductor can not be construed as being that plaintiff was a full-blooded negro, but that he had enough negro blood to be classified with that race, or else that he was a white man degraded (as the conductor himself assumed) by having associated with negroes, or that, having negro blood in his veins, he was attempting to violate the law by putting himself in that portion of the car assigned to whites. In *Bryan* v. *Walton*, supra, Chief Justice Lumpkin says, on page 202: "Our ancestors settled this State when a province, as a community of white men . . possessing an equality of rights and privileges. The blacks were introduced into it, as a race of Pagan slaves. The prejudice, if it can be called so, of caste is unconquerable. It was so at the beginning. It has come down to our day. The suspicion of taint, even, sinks the subject of it below the common level." And on page 205 he says, "In no part of this country, whether North or South, East or West, does the free negro stand erect and on a platform of equality with the white man." In *Flood* v. *News & Courier Co.*, 50 S. E. 637, the Supreme Court of South Carolina held that to publish in a newspaper of a white man that he is colored is libelous per se, and cited numerous authorities to sustain its position. To the same effect was the decision of the Supreme Court of Louisiana, in *Upton* v. *Times Democrat Pub. Co.*, 28 So. 970; and in *Southern Ry. Co.* v. *Thurman*, 90 S. W. 240, the Court of Appeals of Kentucky held that a cause of action was set out. If, as we hold, to call a white man a negro or to intimate that he is of African descent may be an insult (and we think that, under the circumstances detailed in plaintiff's petition, the jury might consider it insulting for any

of three intimations which might arise), then the demurrer should have been overruled. This case is practically identical in principle with those of Davis v. Tocoma Ry. Co., 35 Wash. 203, and Gillespie v. Brooklyn Heights Co., 178 N. Y. 347. In the latter case Judge Martin, delivering the opinion of the court, says, "'The relation between the carrier and its passenger is more than a mere contract relation, as it may exist in the absence of any contract whatever. Any person rightfully on the cars of a railroad company is entitled to protection by the carrier, and any breach of its duty in that respect is in the nature of a tort, and recovery may be had in an action of tort as well as for the breach of the contract. And quoting from Booth on Street Railways, §372, the court proceeds, 'no matter what the motive is which incites the servant to commit an improper act towards the passenger during the existence of the relation, the master is liable for the act and its natural and legitimate consequences.' Hence, it is responsible for the insulting conduct of its servants which stops short of actual violence." In the Gillespie case are very numerous citations, exhaustively treating the subject and establishing beyond any controversy that a common carrier is liable for any injury resulting from the use of language insulting, abusive, or defamatory by one of its servants towards a passenger while in the exercise of his duty.                    *Judgment reversed.*

HILL, C. J., and POWELL. J., concurring. As stated in the third headnote, we think (while Judge Russell does not) that if the conductor, in the exercise of his duties in the dual capacity of police officer and agent of the company in attempting to enforce §527 of the Penal Code, uses extraordinary diligence, that is to say, extreme care and caution, to prevent mistaking a white man for a negro or vice versa, and such a mistake nevertheless results, the carrier would not be liable. We concede that in taking this position we are somewhat at variance with what was said by the Supreme Court in the second division of the opinion in the case of *Seaboard Air-Line Railway* v. *O'Quin,* 124 *Ga.* 359, where a charge substantially embodying this proposition in a case standing upon a somewhat similar basis was disapproved. Still it will be seen that so much of the decision as asserts that this charge was error was obiter, since the court held that such a charge was more favorable to the complaining party than otherwise, and that

the exception therefore could not be considered. Our idea of the matter is this: The carrier is charged by the statute with the absolute duty of separating the races, and is likewise charged with the duty to use extreme care and caution to protect its passengers from insult. In performing the first duty, he must necessarily use his judgment to determine whether the passenger is a white man or a negro; and to the end that no mistake shall be made to the insult of the passenger, he must perform this duty with extreme care and caution; and if still, after all, a mistake is made and a passenger is insulted and consequently injured, the injury is damnum absque injuria.