Darrell Kenyatta EVERS et al., Plaintiffs,

v.

JACKSON MUNICIPAL SEPARATE SCHOOL DISTRICT et al., Defendants.

Civ. A. No. 3379.

United States District Court
S. D. Mississippi,
Jackson Division.

July 6, 1964.

———◆———

Derrick A. Bell, Jr., New York City, Jack H. Young, Jackson, Miss., for plaintiffs.

Thomas H. Watkins, Robert C. Cannada, E. W. Stennett, City Atty., Joe T. Patterson, Atty. Gen. of Mississippi, Dugas Shands, Asst. Atty. Gen. of Mississippi, Jackson, Miss., for defendants.

Dan H. Shell, Satterfield, Shell, Williams & Buford, Jackson, Miss., R. Carter Pittman, Pittman & Kinney, Dalton, Ga., and Geo. S. Leonard, Steadman, for interveners.

MIZE, District Judge.

The complaint in this case was filed on behalf of several minors and their parents. It was alleged that the plaintiffs were all members of the Negro race and that the action was being brought on

their behalf and on behalf of all other Negro children and their parents in Jackson, Mississippi.

The defendants are designated as the Jackson Municipal Separate School District, the individual members of the Board of Trustees of the Jackson Municipal Separate School District, and Kirby P. Walker, Superintendent of Schools.

The relief sought was that the defendants be enjoined from operating a compulsory biracial school system in Jackson, Mississippi, and in the alternative that the Court order the defendants to present a plan to "desegregate" the schools within the Jackson Municipal Separate School District.

After alleging that the defendants did maintain a compulsory biracial school system in the Jackson Municipal Separate School District, the plaintiffs alleged that they were "injured by the refusal of the defendants to cease operation of a compulsory biracial school system in Jackson, Mississippi." It was further alleged that the operation of a compulsory biracial school system violated the rights of the plaintiffs and the members of the class which they purported to represent which were secured to them by the due process and equal protection clauses of the Fourteenth Amendment to the Federal Constitution.

The defendants filed their answer to the complaint. In this answer it was admitted that, with respect to all schools under their supervision and control, there were no schools attended by members of both the white race and the Negro race. The defendants denied, however, that they maintained or operated a compulsory biracial school system and further denied that the fact that no schools were attended by members of both the white race and the Negro race came into existence pursuant to the requirements of state law and denied that such condition was continued, perpetuated or maintained as a matter of state law, policy, custom or usage.

Defendants, in their answer, alleged that the schools in said District were being operated, to the best of their abilities, for the benefit and best interest of all pupils of the District; that the defendants were and are vested with the exercise of judgment and discretion in connection with the assignment of pupils to schools within the District, and that many factors were taken into consideration in connection with their exercise of such judgment and discretion; that one of the factors taken into consideration was the differences and disparities between the ethnic group allegedly represented by plaintiffs and the Caucasian children in the District; that such racial differences are factual in nature, and, as such, can and should be taken into consideration by the defendants in the operation of the schools of the District.

In short, the defendants planted themselves firmly upon the proposition that instead of being injured by separate schools for the members of the Negro and white races that, as a matter of fact, such schools were advantageous to the pupils of both races, and that in the conduct and exercise of their responsibility and duties in connection with the operation of said schools the defendants were acting within their judgment and discretion in taking into consideration the educational characteristics of the Negro and white races.

Thus, the issues were clearly presented by the pleadings. The fact that members of both the white and the Negro races do not attend the same schools was alleged by the plaintiffs and admitted by the defendants. Thus, this is not an issue. The controlling issues are:

1. Are the plaintiffs, or the members of the class they purport to represent, as a matter of fact, injured by the operation of separate schools for the races in the Jackson Municipal Separate School District?

2. Are those charged with the responsibility for the maintenance

and operation of the schools within the Jackson Municipal Separate School District authorized to take into consideration the educational characteristics of the members of the Negro race and the educational characteristics of the members of the white race in connection with the operation of such schools?

A petition to intervene was filed in this cause on behalf of certain minor children and their parents. In this petition it was alleged that the intervenors were members of the white race. The petition to intervene was approved by this Court and the intervenors filed an answer to the complaint. Said answer sets forth in some detail alleged differences and disparities between members of the Negro race and members of the white race and alleges affirmatively that should those charged with the responsibility of the operation and maintenance of the schools of the Jackson Municipal Separate School District ignore or not consider such differences between members of the two races such would cause irreparable injury to the intervenors and to the class they purported to represent, as well as to the plaintiffs and to the class the plaintiffs purported to represent.

Plaintiffs therefore contend that the operation of separate schools for members of the Negro race and members of the white race has resulted and is resulting in injury to the members of the Negro race. The intervenors contend that the operation of schools which members of both the white race and the Negro race attend would result in irreparable damage to the members of both races. The defendants, those charged with the responsibility ·of the operation and maintenance of said schools, contend that the educational characteristics of and the differences between the two races should be taken into consideration as factual matters and the schools operated in such a manner as to give good faith consideration to these factors, along with all other proper factors.

If, as a matter of law, there are no circumstances or conditions under which the educational characteristics of or the differences between the white race and the Negro race as they now exist within the bounds of the Jackson Municipal Separate School District can be considered by those charged with the responsibility of administering such schools, then the preliminary injunction heretofore entered by this Court should be made final. On the other hand, if those charged with the responsibility of administering such schools are to be permitted to take into consideration, along with all other proper factors, the educational characteristics of or the differences between the members of the white and Negro races, then the issues were clearly presented by the pleadings.

The Court was and is of the opinion that in the exercise of their discretion and judgment, such exercise being in good faith and in accord with the principles heretofore enunciated by the Supreme Court of the United States, those responsible for the administration of such schools may take into consideration, along with all other proper factors, the educational characteristics of or the differences between the members of any ethnic groups, including the Negro race and the white race. Therefore, the Court permitted the parties to submit evidence pertaining to the issues as heretofore set forth.

Plaintiffs submitted as witnesses the parents of some of the minor plaintiffs. The substance of the testimony by such witnesses was to the effect that they desired that their children attend "mixed schools," that is, attend schools that were attended by members of both the white race and the Negro race. These witnesses testified that even though it could be shown that separate schools for the members of the Negro race and members of the white race were actually educationally superior for their children, that, nevertheless, such would not be satisfactory since they desired that their children attend "mixed schools." These

witnesses testified, without exception, that their business contacts, their employers, their customers and their business associates were all members of the Negro race. Yet, they insisted that their children attend "mixed schools."

The plaintiffs also placed on the stand Kirby P. Walker, Superintendent of Schools of the Jackson Municipal Separate School District. Mr. Walker testified, in substance, that there were no schools in the District attended by members of both the white and Negro races, insofar as he knew, and that in making temporary assignments to the schools he did take into consideration the educational characteristics of and the differences between the members of the white and Negro races. He testified that of the approximately 37,000 pupils enrolled in the Jackson Municipal Separate School District, approximately 60% were members of the white race and approximately 40% were members of the Negro race; that because of the numbers in both races it was economically possible and feasible to have separate schools for the races, and that this was, in his opinion as an educator, highly advisable and desirable. He further testified that there were no real differences between the facilities, program of studies or courses available as between the various schools within the District, whether they be attended by members of the white race or attended by members of the Negro race.

The plaintiffs then introduced the interrogatories propounded by plaintiffs to defendants and the answers to these interrogatories by the defendants.

Thereupon, the plaintiffs rested. There was no showing nor, in fact, was there any effort to show that the separate schools were unequal or that such actually caused injury to the plaintiffs or to any members of the class which the plaintiffs purported to represent. The plaintiffs obviously rested their case upon the contention and position that any recognition or cognizance of the characteristics of or differences between the members of the various races was not within the scope of the judgment or dis-

cretion to be exercised by those charged with the responsibility of administering the schools.

There was no evidence or testimony showing or tending to show injury resulting to plaintiffs or the class purportedly represented by plaintiffs resulting from separate schools, nor was there any showing of any advantage or merit in the so-called "mixed schools" insofar as plaintiffs were concerned.

Defendants first presented evidence pertaining to the scholastic achievement and mental ability (I.Q.) of the members of the white and Negro races, as reflected by the records maintained by the Jackson Municipal Separate School District, and pertaining to such pupils within such District. These records disclose that there is a wide discrepancy between the scholastic achievement and the mental ability, as shown by recognized tests used nationally.

These records disclosed a noticeable and substantial difference in the scholastic achievement of the members of the Negro and white races and a difference in the scores attained on the nationally recognized mental ability tests, with the white pupils consistently scoring above the national average and the Negro pupils consistently scoring below the national average. The disparity between the members of the two races as reflected by the mental ability tests became more pronounced as the age of the pupils increased.

J. D. Barker testified that this same difference or disparity existed between the members of the two races for as far back as the records of the Jackson Municipal Separate School District were available, which was for a number of years.

This testimony was placed into the record without any objection, cross-examination or contradiction other than the objection as to materiality or relevancy.

The defendants then presented two witnesses who testified as to facts concerning public schools that have been

changed from all-white or all-Negro schools to schools serving members of both races. Congressman John Bell Williams, as a member of a Congressional Investigating Committee, testified concerning the results found by his Committee investigating the public schools of Washington, D. C. after same had been "mixed" for a number of years. His testimony was to the effect that the schools, after the "mixing," were inferior to the schools which had been operated in such a manner as to have the members of the two races attend separate schools. Unquestionably, his testimony was to the effect that the "mixing" of the races in the schools had been injurious to members of both races.

W. S. Milburn testified as a retired educator. He had served as principal of a large high school in Louisville, Kentucky. He had been President of the Southern Association of Colleges and Universities, had served as a member of the Board of Aldermen of Louisville, Kentucky for a number of years, and had extensive experience as an educator. He testified that the "mixing" of the races in Male High School of Louisville, Kentucky had resulted in a deterioration of the school and injury to members of both races.

Thus, the uncontradicted testimony was to the effect that the "mixing" of the races in the same school was injurious to the members of both races.

The defendants also called as witnesses Kirby P. Walker, Superintendent of Schools of the Jackson Municipal Separate School District, and James Gooden, retired Director of the Negro Schools of the Jackson Municipal Separate School District. Each of these witnesses testified, without contradiction, that, in his judgment, as an educator, the operation of separate schools for the members of the Negro and white races within the bounds of the Jackson Municipal Separate School District was for the best interest of the members of both races.

Mr. Gooden is a member of the Negro race. He holds a master's degree in school administration from Northwestern University, Evanston, Illinois, and has served in the public schools of the Jackson Municipal Separate School District for many years. He testified that, in his opinion, the schools in the Jackson Municipal Separate School District were excellent and that it was best for the members of both races that they attend separate schools.

Mr. Walker testified that he had been connected with a study made by M. V. O'Shea, Professor of Education, University of Wisconsin, the results of which were published in 1927, pertaining to the school systems within the State of Mississippi; that such study had been impartially and fairly made and that the ultimate recommendation and conclusion of such study was to the effect that separate schools for members of the white and Negro races were desirable. He further testified that this study disclosed a marked and substantial difference in the scholastic achievement and mental ability of the members of the two races, as reflected by various tests given.

Mr. Walker further testified that as Superintendent of the public schools of the Jackson Municipal Separate School District he has been and is conscious of the differences between the members of the two races, and that in 1954 when the Board of Trustees of the Jackson Municipal Separate School District placed upon him the responsibility of temporarily assigning all applying pupils within the District he did and has taken such knowledge into consideration in making the temporary assignment of such pupils.

Mr. Walker's testimony in this regard is that it was his understanding that after the decision of the United States Supreme Court in the Brown case, in 1954, Brown v. Board of Education of Topeka, Kan., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, the Board of Trustees of the Jackson Municipal Separate School District eliminated any and all attendance areas and placed upon him, as Superintendent of Schools, the responsibility of making temporary assignments; that he was given no instructions pertaining to whether he should or should

not take into consideration the race of any prospective pupil, but was charged with the responsibility of using his judgment, as an educator, in making the temporary assignments. That, in the exercise of this responsibility, he realized, at that time, that members of both races were not attending the same schools, and he therefore analyzed the situation to see if there should be any change; that based upon the best information available to him as it pertained to the pupils in the Jackson Municipal Separate School District, and based upon his own knowledge as an educator, he concluded that it was best for both races that all temporary assignments be made so as not to temporarily assign pupils of both races to the same school.

Mr. Walker's testimony was to the effect that it would be educationally unsound and unfair to mix members of both races in the same school within the bounds of the Jackson Municipal Separate School District, which judgment was supported by records maintained in his office. He further testified that in the event the educational level or achievement on intelligence tests of the members of the races should become more nearly equal, then he would certainly take such into consideration in making assignments at that time.

Mr. Walker and Mr. Gooden emphasized the difference between the relationships of teachers and pupils as contrasted with the relationships of teachers and students. They testified that the children attending the public schools of the Jackson Municipal Separate School District are pupils, and, as such, are entitled to and do receive from their teachers much more than formal academic instruction; that the relationship is one of *in loco parentis* and the teachers have a very personal relationship with the pupils, involving personal habits, desires, attitudes and behavior; that an understanding by the teacher of his pupil is an essential preliminary to successful learning and facilitates educational progress. They pointed out that not only

were disciplinary problems minor where there were separate schools for the races, but that such schools had a much higher holding power over the pupils. In confirmation of this statistics were introduced showing a greater average number of years of education attained by the adults in the City of Jackson than in comparable cities throughout the nation, and also more than in the large metropolitan areas of the nation where there have been "mixed schools" even though Mississippi does not have a compulsory education law.

Mr. Walker supported his claim of educational benefit to be secured from separate schools for the two races by pointing out that the Negro pupils of the District were actually over-achieving in many subject matters. He pointed out that a teacher of the same race as the pupil is much more likely to develop the substitute parent, or *in loco parentis*, relationship with the pupil, to understand the pupil and to obtain maximum effort from the pupil without antagonizing the child, creating an educational rejection, or inflicting psychological injury to the child.

In short, the testimony of Mr. Walker and Mr. Gooden was to the effect that in their judgment, based upon the facts as they exist in the Jackson Municipal Separate School District, separate schools for members of the Negro and white races were highly desirable and were beneficial to members of both races. Their testimony was to the effect that to mix the races in the same schools would be highly injurious, from an educational standpoint, to the members of both races.

All of this evidence stands uncontradicted in the record.

Intervenors produced seven distinguished scientists, a number of whom were shown to have been among the leaders of and recipients of major honors in their professions. Their areas of specialization included differential and social psychology, biology, genetics and child neurology. Each of these witnesses testified to the existence of such differ-

ences between the two groups to constitute a rational basis for separate schooling. Plaintiffs challenged neither their qualifications nor the truth of the matters and conclusions which their testimony and exhibits established or supported.

Accordingly, the Court finds from this uncontradicted evidence that the Negro and Caucasian races developed in different geographic areas under differing climatic conditions over periods of time measurable only in geologic terms.

Physical and mental variations exist between the two groups which necessarily include differences in traits of temperament, thought patterns, learning capacities, and other elements directly affecting the educational potential of the group members. In the case of Caucasians and Negroes, such differences may be directly confirmed by comparative anatomical and encephelographic measurements of the correlative physical structure of the brain and of the neural and endocrine systems of the body. The evidence was conclusive to the effect that the cranial capacity and brain size of the average Negro is approximately ten per cent less than that of the average white person of similar age and size, and that brain size is correlated with intelligence.

The differences in some of these varying elements of mentality are subject to evaluation by observation and testing. While not all aspects of an individual's learning pattern are susceptible to precise measurement, a number of factors which have a high correlation with scholastic success such as mental maturity, learning achievement, motor control and the like can be objectively scored against nationally standarized norms.

Starting with the Army alpha tests during World War I, and continuing since, several hundred major tests in all parts of this country and abroad have been made to determine the relative aptitudes of Negro and white children. With no exceptions and regardless of whether the testing was done in a segregated or integrated community, between white and Negro groups matched for equivalent socio-economic circumstances, the results have been substantially identical with those testified to as resulting from the tests in Jackson from 1927 to the present. The witnesses specifically referred to results reported from such testing in the schools of New York, Washington, Charleston, Birmingham, Mobile, Wilmington, Savannah, Atlanta and Dallas, all of which had patterns similar to those measured in Jackson, and all of which showed that the average Negro pupil falls behind the average white pupil more than one year in every four, so that when the average white child reaches the 12th grade level, the average Negro child has not yet reached the 9th grade level.

The differences so measured were not limited to the change of learning rate and ultimate difference in relative mental age or I.Q. which the Court has previously noted, but included as well an even more fundamental distinction in educational patterns, that of subject interest and problem approach. The witnesses were unanimous that these differences were not only substantial in themselves but were of major importance in determining the method of teaching, the selection and content of courses and fixing the progress norms. This was true even though an individual of one group would overlap the other in one or more of the measured factors since these did not show a change in the over-all pattern. To test this, a large number of Negro and white children were paired in one study for identical scoring on I.Q. tests and remeasured annually thereafter for a number of years. Instead of staying the same, the two groups drifted apart at a rate which was a characteristic of normal group variation and after three years they were the typical one year apart in terms of I.Q., measured by the same tests.

It was testified that there has never been any substantial scientific argument as to the correctness of such test results, but that a number of sociologists and psychologists have argued an "environ-

mental" or a "Cultural Hypothesis" to the effect that the Negro result will approach the white norm to the degree that the socio-economic and cultural status of the Negroes involved in the testing have been raised to the comparable white group. To the contrary, it was shown by the witnesses that these differences in educability are not and cannot be changed either by a change of the student's environment or the betterment of his social condition or intimate associations with members of the white race. They reviewed a number of studies which had been made on the basis of matching Negro and white children so as to bring about socio-economic equality in integrated communities. In each such study the differences between the two groups was slightly less in the lower socio-economic levels than in the higher, and hence the "Cultural Hypothesis" was shown to be both unsupported and negated by the facts. The witnesses emphasized that the widespread economic and cultural improvement in the status of the Negro population in America over the past half century had not diminished the differences shown to exist between Negroes and whites.

The differences measured by the Army in 1917 are virtually identical to those shown by the latest comparative studies. Both in Wilmington, North Carolina, and Jackson, Mississippi, comparisons were made over a 40-year period which showed no change, although it appears that in both Wilmington and Jackson there have been major improvements made over this period not only in the relative economic position of the Negro but also great improvements in the Negro schools, in teaching, plant and in per capita pupil expenditure as between Negro and white—to the point that there is no substantial difference at the present time. Mr. Gooden, the former Director of Negro schools, testified that when he came into service in Jackson 35 years ago there was not a single Negro teacher holding a college degree, while today there is not one who does not. Yet the tests that measure learning potential and

which have a high national correlation with success in the public schools, today still show the same variations between these two groups as existed in 1927.

A special test was also made to determine whether intelligence tests unduly favored white pupils because of containing cultural questions which might be less familiar to Negro families. The results were again contrary to the "Cultural Hypothesis" in that the Negro group scored relatively higher on those questions which had been rated by educators as being most highly cultural in content.

The Court concludes that white and Negro pupils of public school age have substantially different educational aptitudes and learning patterns which are innate in character and do not arise out of economic or social circumstance and which cannot therefore be changed or overcome by intermixed schooling or other change of condition or environment within the powers of this Court to decree. The Court finds such differences to be racial traits so directly related to the learning process as to reasonably require separate forms of instruction in separate schools if equal educational opportunity is to be made available to the children of both races.

Apart from any differences in learning aptitude between white and Negro pupils, the evidence showed without contradiction that effective learning can only occur under conditions in which the individual's attention can be given to study without unnatural distractions. Such receptivity occurs only when the learner is in a group with which he has an empathic relation, such as with his family, his kind, his neighbors of like interests, or other groups with which he identifies himself as an individual and in which, because of his similarity of characteristic, he is an accepted group member.

Negro and white children identify themselves in terms of race, and other obvious physical characteristics in the earliest pre-school years. They assume intuitively that things that do not look

alike are not alike, that things that look alike are alike, and that things are what they seem. It does not appear that this identification is caused either by school or society but rather arises primarily from a natural biological selection mechanism which plays a part in maintaining evolutionary diversity of type and is described scientifically as ethnocentrism. While race preferences resulting from gross race differences may be consciously overriden by mature individuals, they remain as an inherent mechanism so that no individual ever becomes completely unconscious of such a difference.

In the classroom, the intermingling of two groups, each having a high degree of self-identity, causes a heightening of consciousness of group, a result which grows as the number of contacts between them is increased. Compulsory intermixing therefore exaggerates rather than diminishes any divisive forces which exist.

This is particularly the case where one of two different groups differ in performance in a common effort or endeavor such as learning in schoolrooms. In such a common environment or class, the slower of the two groups would be driven to compensate for their comparative shortcomings either by rationalization in the form of discrediting educational values and dropping out of school, or by substitution of diversionary, attention-seeking delinquent behavior.

Apart from the success of separate classes in the Jackson schools, from the evidence I find that separate classes allow greater adaptation to the differing educational traits of Negro and white pupils, and actually result in greater scholastic accomplishments for both. Results were reported from other areas which prove this to be the case generally. Jack Greenberg, General Counsel of the NAACP, the organization conducting this litigation for plaintiffs, and K. B. Clark, the principal expert witness relied on by that organization in the school cases underlying Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and named in Footnote 11 thereof as an authority, were shown to have published reports to the effect that a substantially greater percentage of Negro pupils from segregated Southern schools are able to meet minimal national college entrance standards than those from Northern integrated schools, and that Negro pupils from Southern segregated high schools have shown greater academic success in Northern interracial colleges than those who graduate from intermixed schools in the North.

Finally, it was shown that Negro pupils educated in separate schools enjoy a much higher degree of mental orientation, personal assurance and peace of mind than those forced to compete in mixed schools. It was pointed out in this case that in the cases underlying Brown v. Board of Education of Topeka, supra, in order to prove injury resulting from segregation, the witness, Dr. Kenneth B. Clark, referred to a test conducted by him on only 16 children in a segregated school, which was said by him to show that a majority of Negro children in a segregated school identified themselves with a white rather than Negro doll, and that it could be concluded from this that they had suffered a loss of racial identity which injured their personality. By comparison, the same test was shown to have been conducted by a Negro principal of unquestioned integrity on 85 Negro school children in the segregated schools in Jackson. Ninety-five per cent of those in Jackson identified themselves with the Negro doll and showed a complete absence of the personality injury which Dr. Clark testified that he found in his test of 16 which formed the sole basis for his testimony as to personality damage in Brown. In another study by the same Dr. Kenneth B. Clark, not called to the attention of the Supreme Court in Brown, involving many scores of Negro children in integrated and segregated situations in the North and South, it was reported that injury from personality conflict, if any, is suffered primarily by Negro children reared and schooled in integrated classes

of the North—not in the segregated schools of the South. From this corroborating evidence, I am forced to find that the principal evidence of injury relied on by the Supreme Court in Brown was unworthy of belief.

The witnesses also were unanimous to the effect that there is no known scientific study showing the existence of injury resulting to Negro children through separate education. It was in fact pointed out that the two principal authors of the Social Science Statement submitted to the Supreme Court as an "Appendix" to the brief of counsel for the Negro children in Brown, Drs. Clark and Klineberg, have each since that time stated that nothing presented to the Supreme Court in that case was intended to mean injury to a Negro child arising from segregation *per se*. This shows what appears to have been a pattern of evasion of fact, if not an actual misleading concealment of fact in that case.

 While race or color as such or "alone" has been held not to be a valid basis for the separation of Negro and white school children, nevertheless, it is well established, contrary to plaintiffs' position, that there is no affirmative obligation imposed by the Constitution to compel intermixing of school children. Bell v. School City of Gary, 324 F.2d 209 (7th Cir., 1963), Cert. Den. 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216; Boson v. Rippy, 285 F.2d 43, 45–46 (5th Cir., 1960); Kelley v. Board of Ed., 270 F.2d 209, 229 (6th Cir., 1959), Cert. Den. 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240; Borders v. Rippy, 247 F.2d 268, 271 (5th Cir., 1957), 250 F.2d 690, 692–693 (1957); Avery v. Wichita Falls Indep. School Dist., 241 F.2d 230, 233 (5th Cir., 1957), Cert. Den. 353 U.S. 938, 77 S.Ct. 816, 1 L.Ed.2d 761. Separation of races by law or custom in and of itself is not proof of an unconstitutional discrimination, unless it appears that there exists no valid ground for such separation. Arnold v. North Carolina, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964); Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964); Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954).

Same things must be treated the same, but as the Supreme Court pointed out in Tigner v. State of Texas, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124:

"The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same."

 Public authorities may exercise a wide scope of discretion in classifying people and things where there is a reasonable basis for so doing. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911); Morey v. Doud, 354 U.S. 457, 463–464, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957). *Discrimination* or *classification*, to be in conflict with the equal protection clause of the 14th Amendment, must be arbitrary, unreasonable, irrational or invidious. As held in Morey v. Doud, supra, 463–464, 77 S.Ct. 1349:

"The rules for testing a discrimination have been summarized as follows:

" '1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the

burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary.' Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79 [31 S.Ct. 337, 340, 55 L.Ed. 369]."

Courts take judicial notice of the fact that there are such intrinsic differences between Caucasians and other ethnic groups as to constitute a rational basis for legislative or administrative classification between them. Gong Lum v. Rice, 275 U.S. 78, 86, 48 S.Ct. 91, 72 L.Ed. 172 (1927); Farrington v. T. Tokushige, et al., 11 F.2d 710 (C.A.9, 1927); Wolfe v. Georgia R. & Elec. Co., 2 Ga.App. 499, 58 S.E. 899 (1907). Typical is the statement of former Chief Justice Richard B. Russell in the latter case:

"*Certainly every court is presumed to know the habits of the people among which it is held, and their characteristics,* as well as to know leading historical events and the law of the land. * * *

"We are not compelled to plant our decision on the ground of inequality or inferiority. We take judicial notice of an intrinsic difference between the two races. Certainly, if a court can take judicial notice of near a thousand things, some even of slight importance, which have been judicially recognized without proof, this court may be presumed to observe that there is a marked difference between a Caucasian and an African. Notice of this difference does not imply legal discrimination against either, and for that reason cannot * * * impugn or oppose the fourteenth and fifteenth amendments * * *." (Emphasis supplied)

Mr. Justice Frankfurter expressed a great truth when he said in Beauharnais v. People, 343 U.S. 250, 262, 72 S.Ct. 725, 733, 96 L.Ed. 919:

"Only those lacking responsible humility will have a confident solution for problems as intractable as the frictions attributable to differences of race, color or religion."

In United States v. Carolene Prod. Co., 304 U.S. 144, 153, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938), the court said:

"Where the existence of a rational basis for legislation whose constitutionality is attacked depends upon facts beyond the sphere of judicial notice, such facts may properly be made the subject of judicial inquiry, * * * and the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."

In this case the evidence as to racial differences of such significance as to reasonably require separation of school children for educational purposes is overwhelming, undisputed and unchallenged.

Here plaintiffs have conceded, by their unwillingness or inability to contest the issues of which they had been seasonably informed, first, that the learning traits which are characteristic of Negro children do differ to an educationally significant degree from those which are typical of white pupils; second, that separate classes with teachers of the same race are academically superior and maintain a better disciplinary status; third, that such classes substantially diminish the number of delinquents and drop-outs in the schools; fourth, that such separate classes alone can be adapted to the difference in instruction which is necessary to realize for the learning patterns of both groups the equality of educational opportunity which the Constitution requires; fifth, that differences between Caucasians and Negroes are genetically determined and cannot be changed materially by environment; and, sixth, that integration—not segregation—injures the Negro school child.

Physical and mental traits are appropriate bases for the reasonable classification of individuals under the

equal protection clause; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937); Muller v. Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551 (1908); Quong Wing v. Kirkendall, 223 U.S. 59, 32 S.Ct. 192, 56 L.Ed. 350 (1912); Fahr and Ojemann, "The Use of Social and Behavioral Science Knowledge in Law," 48 Iowa L.R. 59 (1962); International Broth. of Teamsters, Local 695, AFL v. Vogt, Inc., 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957), Approving Note, (F. Frankfurter), 28 Harv.L.R. 790 (1915), and may be used to overcome a judicial presumption, United States v. Provident Trust Company, 291 U.S. 272, 54 S.Ct. 389, 78 L.Ed. 793 (1934); Beach v. Beach, 72 App.D.C. 318, 114 F.2d 479, 131 A.L.R. 804 (C.A.D.C., 1940).

The Supreme Court in Brown specifically limited its holding to white and Negro children of "the same age and qualifications" who are treated differently "solely on the basis of race" or "solely because of their race" (347 U.S. 483, 493–494, 74 S.Ct. 686, 691). This accords with the ruling in Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) noted above, decided two weeks before Brown, that in racial matters, invidious discrimination exists only when there is " * * * different treatment not based on some reasonable classification * * *."

In this Circuit the standard of proof in such cases has been set as "any reasonable classification of students according to their proficiency or health * *." Orleans Parish School Board v. Bush, 242 F.2d 156 (5th Cir., 1957).

Here the proof called for by the Circuit Court has been given and, as the record now stands, it is conclusive that the existing assignment of children in the schools of Jackson constitutes a reasonable classification of these children. To change to mixed schools, such as plaintiffs demand in their complaint, would substantially destroy the present levels of academic achievement in the school district and deny to plaintiffs'

class the equality of educational opportunity, which they are entitled to have.

During the trial, plaintiffs requested and were given a continuing objection to the introduction of any evidence which would tend to show a reasonable classification on the basis of educationally significant traits or otherwise.

■ It was the contention of plaintiffs that the decision of the Supreme Court in Brown v. Board of Education is "the law of the land," binding on all courts and all people in this nation. Since plaintiffs ground their case on that proposition, we must discuss it. A decision of the Supreme Court *interpreting* a constitutional provision has such binding effect, but a decision which simply *applies* a well-recognized constitutional provision to a state of facts is not binding on persons not parties or privies to the record in that particular case and is only persuasive even where the facts in another case are similar. One of the best discussions of this proposition to be found is that by Mr. Justice Brandeis in his dissenting opinion in Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 52 S.Ct. 443, 76 L.Ed. 815, which cites with approval an article appearing in 14 Harvard Law Review 273, by Arthur W. Machen, Jr. Justice Brandeis stated:

"*Stare decisis* is not, like the rule of *res judicata*, a universal inexorable command. 'The rule of *stare decisis*, though one tending to consistency and uniformity of decision, is not inflexible. * * *'

"In the cases which now come before us there is seldom any dispute as to the interpretation of any provision. The controversy is usually over the application to existing conditions of some well-recognized constitutional limitation. This is strikingly true of cases under the due process clause when the question is whether a statute is unreasonable, arbitrary, or capricious; of cases under the equal

protection clause when the question is whether there is any reasonable basis for the classification made by a statute; and of cases under the commerce clause when the question is whether an admitted burden laid by a statute upon interstate commerce is so substantial as to be deemed direct. These issues resemble, fundamentally, that of reasonable care in negligence cases, the determination of which is ordinarily left to the verdict of the jury. In every such case the decision, in the first instance, is dependent upon the determination of what in legal parlance is called a fact, as distinguished from the declaration of a rule of law. When the underlying fact has been found, the legal result follows inevitably. The circumstance that the decision of that fact is made by a court, instead of by a jury, should not be allowed to obscure its real character." (285 U.S. pp. 410, 411, 52 S.Ct. p. 449)

Continuing, he said:

"The doctrine of *res judicata* demands that a decision made by the highest court, whether it be a determination of a fact or a declaration of a rule of law, shall be accepted as a final disposition of the particular controversy, even if confessedly wrong. *But the decision of the court, if, in essence, merely the determination of a fact, is not entitled, in later controversies between other parties, to that sanction which, under the policy of stare decisis, is accorded to the decision of a proposition purely of law. For not only may the decision of the fact have been rendered upon an inadequate presentation of then existing conditions, but the conditions may have changed meanwhile.* Compare Abie State Bank v. Bryan, 282 U.S. 765, 772 [51 S.Ct. 252, 75 L. Ed. 690]. *Moreover, the judgment of the court in the earlier decision may have been influenced by pre-vailing views as to economic or social policy which have since been abandoned."* (p. 412, 52 S.Ct. p. 449) (Emphasis supplied)

Later cases citing the foregoing with approval are: National Mutual Insurance Company of District of Columbia v. Tidewater Transfer Co., 337 U.S. 582, 616, 617, 69 S.Ct. 1173, 93 L.Ed. 1556 (Footnote 11); Smith v. Allwright, 321 U.S. 649, 664–685, 64 S.Ct. 757, 88 L. Ed. 987 (Footnote 11); Helvering v. Griffiths, 318 U.S. 371, 400, 401, 63 S. Ct. 636, 87 L.Ed. 843 and Monroe v. Pape, 365 U.S. 167, 220, 222, 81 S.Ct. 473, 5 L.Ed.2d 492.

The difference between the "interpretation" of a constitutional provision as distinguished from the "application" of a constitutional provision to varying facts, is commented on by Arthur W. Machen, Jr., in the article mentioned above, cited with approval by Justice Brandeis:

"* * * The law of the Constitution remains forever unchanging; the facts to which it must be applied are infinitely various.

"The distinction between law and fact is, however, often so difficult and illusory that constitutional cases which really turn on matters of fact sometimes seem to establish some novel proposition of law. Hasty inferences, therefore, in regard to such matters should be avoided. For such decisions are often thought to prove that the interpretation of the Constitution may vary—a position which has already been proved untenable. * * *" (p. 273)

"One result of confusion of law and fact in constitutional cases is that decisions rendered upon one state of facts are cited for authority under totally different circumstances. * * * Indeed, one unfortunate consequence of the reverence of the common law for judicial precedent is the likelihood that decisions on matters of mere fact will be treated as establishing a

rule of law. This is exemplified wherever a court is called upon to decide questions of fact. * * *" (p. 275)

"The difficulty of determining the precise point at which the changes in the facts of the case may properly make a difference in the decision of the court is unquestionably enormous. It is always extremely difficult to draw a sharp line between cases which gradually shade into one another. One cannot say precisely what statutes should be held arbitrary even on a given state of facts; and the difficulty is intensified a hundredfold where the facts are constantly changing, now slowly, now with almost startling rapidity. Indeed, the Supreme Court expressly refuses to lay down any general rule, and contents itself with determining, as each case is presented, on which side of the line it falls. This is clearly the proper mode of procedure." (p. 278)

This case, like the four underlying Brown cases, involves the *application* of the equal protection clause of the 14th Amendment to a factual situation. *Interpretation* is not involved. In this case, as in Brown, the decision of the court was "dependent upon the determination of what in legal parlance is called a fact, as distinguished from the declaration of a rule of law." The findings of fact in the four underlying Brown cases were based solely upon evidence adduced in behalf of Negro school children and not rebutted by any evidence adduced by the defendant school boards. Neither school authorities nor school children of Jackson were parties or represented by parties in any of those cases. Therefore, Brown does not bind them either under the doctrine of *res judicata* or *stare decisis*. The due process clause of the 14th Amendment requires that they have the same opportunity to be heard as those school boards and children involved in the four underlying Brown cases. Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565.

■ During the trial, the plaintiffs requested and were given a continuing objection to the introduction of any evidence involving educationally significant traits of the Negro and white races which were considered by Superintendent K. P. Walker in making temporary assignments of pupils of the District. This Court is of the opinion that such evidence is admissible and should be considered by the Court. Accordingly, that objection is now overruled.

Although the findings of fact and conclusions of law as set out in the foregoing opinion would require a dismissal of the complaint, this Court is mindful of the decisions rendered by the United States Court of Appeals for the Fifth Circuit on June 18, 1964, in Stell v. Savannah-Chatham County Board of Education, 333 F.2d 55, Armstrong v. Board of Education of the City of Birmingham, 333 F.2d 47, and Davis v. Board of School Commissioners of Mobile County, 333 F.2d 53. It appears from the opinions of the Fifth Circuit in those cases that evidence similar to that presented in this case was considered by the Fifth Circuit. There appear to be, however, some basic differences in the evidence submitted in this case and that considered by the Fifth Circuit. As an illustration, in the Stell case the Fifth Circuit stated as follows:

"The real fallacy, Constitutionwise, of the classification theory is that many of the Negro pupils overlap many of the white pupils in achievement and aptitude but are nevertheless to be segregated on the basis of race. They are to be separated, regardless of how great their ability as individuals, into schools with members of their own race because of the difference in test averages as between the races. Therein is the discrimination. The individual Negro student is not to be treated as an individual and al-

lowed to proceed along with other individuals on the basis of ability alone without regard to race."

The facts in this case are to the effect that even though there is an "overlap" of certain Negro pupils with white pupils in achievement and aptitude, nevertheless such pupils do not progress at the same rate and therefore even though a Negro pupil and a white pupil may be similar in achievement and aptitude at the beginning of the school term, such would not hold true throughout the school year and the difference or disparity would become even more marked with each subsequent year.

Nevertheless, this Court feels that it is bound by what appears to be the obvious holding of the United States Court of Appeals for the Fifth Circuit that if disparities and differences such as that reflected in this record are to constitute a proper basis for the maintenance of separate schools for the white and Negro races it is the function of the United States Supreme Court to make such a decision and no inferior federal court can do so. Although it is contrary to the facts and the law applicable thereto, this Court feels that it is required to enter an order making permanent the temporary injunction heretofore entered herein and denying the injunction prayed for by the intervenors in this case.

In the opinion of this Court, the facts in this case point up a most serious situation, and, indeed, "cry out" for a reappraisal and complete reconsideration of the findings and conclusions of the United States Supreme Court in the Brown decision, as interpreted by the United States Court of Appeals for the Fifth Circuit. Accordingly, this Court respectfully urges a complete reconsideration of the decision in the Brown case.

Due to the equitable nature of this case and the facts as presented herein, the Court does not feel that costs should be awarded to any party as against any other party.