Ralph STELL, by Next Friend, et al.,
Plaintiffs,

v.

SAVANNAH–CHATHAM COUNTY
BOARD OF EDUCATION
et al., Defendants,

and

Lawrence Roberts et al.,

and

United States of America, Intervenors.
Civ. A. No. 1316.

United States District Court
S. D. Georgia,
Savannah Division.
April 1, 1966.

Basil Morris, Morris & Morris, Savannah, Ga., for defendants-appellants.

E. H. Gadsden, Savannah, Ga., Derrick A. Bell, Jr., New York City, Donald L. Hollowell, Atlanta, Ga., for plaintiffs-appellants.

Nicholas Deb. Katzenbach, U. S. Atty. Gen., John Doar, Asst. Atty. Gen., Frank M. Dungaugh, Warren N. Weir, Attys., Dept. of Justice, Civil Rights Div., Washington, D. C. for intervenors-appellants.

J. Walter Cowart, Savannah, Ga., R. Carter Pittman, Pittman & Kinney, Dalton, Ga., for defendants-intervenors-appellees.

## ORDER ON PLAN OF DESEGREGATION
### FINDINGS OF FACT

SCARLETT, District Judge.

(1) This action was commenced in January, 1962.

(2) The plaintiffs are Negro school children attending the Savannah-Chatham County schools suing by next friend on behalf of themselves and others.

(3) The defendants are the Board of Education for the City of Savannah and County of Chatham, its members and officers, and the Superintendent of Schools of Chatham County.

(4) The defendant intervenors, Roberts, et al., are White school children suing by their parents and next friend in their own behalf and on behalf of other White children similarly situated.

(5) This case was tried on its merits in June, 1963, and a decision rendered on June 28, 1963. (See 220 F.Supp. 667.)

(6) On August 23, 1965, this Court, after hearing, entered an order on a plan of desegregation submitted by the defendant Board of Education which, for the reasons stated in the opinion of the Court of that date, was disapproved and disallowed. (Race Relations Law Reporter, Volume 10, Number 3, Fall, 1965, page 1044). The parties were then ordered to prepare and submit a plan of desegregation consistent with such order.

(7) On November 3, 1965, another hearing was held at which a revised plan of desegregation approved by counsel for defendant Board of Education and counsel for the White intervenors was submitted to the Court. At said time counsel for plaintiffs requested additional time to study the proposed plan and to file objections thereto if desired. Said request was granted.

(8) Counsel for the plaintiffs thereafter filed no objection to the plan submitted on November 3rd. However, on November 12, 1965, Nicholas deB. Katzenbach, Attorney General of the United States, moved to intervene in the case. Said intervention was allowed without objection. The motion to intervene was accompanied by objections to the plan for desegregation presented to the Court on November 3rd.

(9) After said objections became a part of the record, the plan submitted on November 3rd was withdrawn, revised and resubmitted to the Court. No formal objection to the revised plan has been filed. The objections to the plan of November 3rd filed by the Attorney General in behalf of the Justice Department were:

1. The plan fails to eliminate the effect of past racial assignments.

2. The plan fails to provide for the assignment of students entering the first, seventh, and tenth grades without regard to race.

3. The plan fails to provide for the non-racial assignment of students who newly move to Chatham County or who move from one district to another within the system.

4. The plan fails to provide for the desegregation of all 12 grades by September of 1966.

5. The plan fails to provide for the desegregation and non-discriminatory hiring, placing and retention of faculties and administrative personnel.

6. The plan fails to provide for transportation, facilities, and opportunity for activities, without regard to race.

7. The plan fails to provide for notice to individual parents, in simple and clear language, of the rights and procedures available under the plan.

(10) Apparently in response to objections 2, 3 and 4, the revised plan completely eliminates race and color as determining factors in the plan of desegregation and paragraph 12 requires the desegregation of all school grades by September, 1966.

(11) The revised plan provided for the non-discriminatory paying and retention of faculties but made no provision for non-discriminatory hiring, which will be dealt with hereafter.

(12) In order to meet the seventh objection by the Justice Department, the proposed plan was revised so as to require publication of it in a newspaper of general circulation in Chatham County, Georgia, within thirty days and thereafter at least once each year.

(13) The Justice Department thereafter gave notice of the taking of depositions of ten witnesses at the Office of the Board of Education in Savannah on December 22, 1965, for use at the hearing before the Court in Brunswick on December 27th (later continued by consent of parties to December 29th). At the hearing on December 29th in Brunswick, the following stipulation was entered into in open court:

"All parties agree that there shall be submitted to Honorable F. M. Scarlett, United States District Judge, the following questions for determination in the above stated case:

1. The admissibility, particularly with reference to Rule 26, of the depositions taken in Savannah, Georgia on December 22, 1965, upon notice by the Government and the Exhibits referred to therein and if such depositions are admitted then the questions as to relevancy and materiality thereof;

2. All Motions pending in the above stated case, including the motion filed by Plaintiff to Dismiss the Defendants Intervenor as parties, if such motion is still pending;

3. The approval of a plan for desegregation.

It is further agreed that briefs shall be filed and served upon opposing Counsel not later than January 20, 1966 and any reply briefs shall be filed and served not later than January 31, 1966."

(14) Said stipulation was not made a formal order of Court at that time but was subsequently approved and sanctioned by the Court in order that the record might be brought to a close in an orderly manner within time limits fixed by the Court. Within the time allowed under the order of Court the Justice Department filed with the Court a proposed plan for desegregation. The Board of Education submitted the same plan as that disallowed by the Court in its order of August 23rd. No plan of desegregation has been submitted by the plaintiffs at any time since the pendency of this litigation.

(15) In addition to the testimony by depositions, Dr. Thord M. Marshal, Superintendent of the Savannah-Chatham County Schools, testified in person at the hearing in Brunswick. He testified in effect that under the policy followed in Savannah White applicants for teaching positions in Savannah were required to have a minimum score of 500 on the National Teachers Examination before they could be employed, but that a minimum score of only 400 is required of Negro applicants. No attempt was made to explain the discrimination in favor of Negroes over Whites in the employment practices of the Board. This undisputed evidence of discrimination against White applicants for teaching positions in Savannah has peculiar significance in view of the undisputed facts developed in this case prior to the Court's ruling of August 23, 1965, to the effect that after employment, "the mean yearly salary of Negro teachers markedly exceeded that of the white teachers", and that "Negro principals assigned relatively lower competence ratings to the Negro teachers under their supervision than the White principals assigned to the White teachers under their supervision".

(16) The defendant Board of Education has given no indication to the Court that it intends to cease discriminating against White applicants and teachers in favor of Negro applicants and teachers. Since its entry into this case the United States Government has shown not the slightest concern over such discrimination.

## CONCLUSIONS OF LAW

The above stipulation delineates the questions with which the Court is now concerned.

■■ (1) Since the Justice Department of the United States Government did not intervene in this case until November 12, 1965, it has no standing to question any actions or rulings in the case prior to said date. It is the rule, applicable alike to all parties, that:

"[O]ne who intervenes in a suit in equity thereby becomes a party to the suit, and is bound by all prior orders and adjudications of fact and law as though he had been a party from the commencement of the suit." Galbreath v. Metropolitan Trust Co. of California, et al., 134 F.2d 569, and cases cited.

(2) In the decision of August 23, 1965, disapproving and disallowing the plan of desegregation submitted by the defendant Board of Education, it was pointed out that there was "no indication that integration is to be accomplished in any other manner than congregating children because of race and color." It was also pointed out that all of the evidence adduced in the case at the trial on the merits was undisputed to the effect that school children cannot be successfully educated under conditions of massive integration without respect to age, mental qualifications, learning capacity, educability and intelligence in general. This Court then construed the law as interpreted by the higher courts to mean that "separation may not be accomplished by using race and color as sorting criteria" but that age, mental qualifications, capacity to learn, educability and intelligence in general are valid sorting criteria, and that under the evidence the school children of Savannah may and should be so classified in order to provide the best possible education for all school children with the largest possible benefit and the least possible detriment to all. Since the order of August 23rd is binding upon all parties in this case, and this order merely supplements it, a copy is attached hereto for convenience.

(3) The first numbered paragraph of the above-quoted stipulation raises a question as to the admissibility of the depositions taken by the United States Government in Savannah on December 22, 1965, for use at the hearing in Brunswick less than 100 miles away. The objection was as to the admissibility, particularly with reference to Rule 26 of the Rules of Civil Procedure. If admissible under that Rule, then objections were as to the relevancy and materiality thereof.

Under Rule 26(d) (3):

"The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: * * * 2, that the witness is at a greater distance than 100 miles from the place of trial or hearing * * *."

The Justice Department insists that such depositions are admissible under the specific language of Rule 26(d) (2) which provides that:

"The deposition of a party or of any one who at the time of taking the deposition was an officer, director, or managing agent of a public or private corporation * * * which is a party may be used by an adverse party for any purpose."

As a basis for its contention the Justice Department claims that each of the witnesses whose depositions were taken in Savannah was a "managing agent" within the meaning of said Rule. If each of such witnesses was a "managing agent", Rule 26(d) (2) is without meaning and is useless, if not harmful.

The Justice Department relied on the maritime case of Warren v. United States, 17 F.R.D. 389 (S.D.N.Y.1955), to sustain its position. The *Warren* case involved a naval officer who was held to be a "managing agent" of the United States. A number of decisions of federal courts hold that the master of a ship is a "managing agent" within the meaning of Rule 26 and may be examined as such. See Aston v. American Export Lines, Inc., D.C., 11 F.R.D. 442; Curry v. States Marine Corporation of Delaware, D.C., 16 F.R.D. 376; Fay v. United States, D.C., 22 F.R.D. 28.

The specific question was answered recently in the case of Southern Pacific Company v. Duncan, 230 Or. 179, 368

P.2d 733, 98 A.L.R.2d 617, where the Oregon Supreme Court, quoting Judge Weinfield of the Southern District of New York in Krauss v. Erie R. Company, 16 F.R.D. 126, 127, said:

"A managing agent, as distinguished from one who is merely 'an employee' is a person invested by the corporation with general powers to exercise his judgment and discretion in dealing with corporate matters; he does not act 'in an inferior capacity' under close supervision or direction of 'superior authority.' "

The Court specifically answered the contention similar to that of the Justice Department in this case to the effect that since a ship master is a "managing agent", an assistant to a school master should likewise be considered a "managing agent", saying:

"No one can quarrel with this conclusion of the federal courts [that a ship master is a 'managing agent'] for it is common knowledge that a ship is a wanderer to many ports of call and thus more often than not is far from the direct control and supervision of its owner. Under these circumstances the master must be the fully authorized agent of the owner to meet the unforeseen demands of a voyage. United States v. The Malek Adhel, 2 How. 210, 43 U.S. 210, 11 L. Ed. 239; Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97."

The Oregon court thereupon rejected the idea that an employee of a railroad company in charge of a train is a "managing agent" and declared that no analogy can be drawn between such cases and maritime cases.

█ For one to be a "managing agent" within the meaning of Rule 26, the interest of the corporation should be so close to his own and to his heart that he could be depended upon in all events to carry out his employer's directions.

█ To the effect that a mere employee is not a "managing agent" within the meaning of the Rule that depositions may be used in a case when the witness is less distant than 100 miles from the place of hearing, see, for further authority, 98 A.L.R.2d 632, 634, 637; 23 Am.Jur.2d, Section 241, page 627.

The Court knows of no exceptions to Rule 26 in favor of the Government. This ruling as to the inadmissibility of the depositions taken in Savannah makes it unnecessary to rule on the materiality or relevancy of such testimony.

(4) Dr. Thord M. Marshal, Superintendent of Schools of Savannah-Chatham County, testified in person at Brunswick at the hearing. No question has arisen as to the inadmissibility of the testimony of Dr. Marshal. He was a "managing agent" for the School Board and his testimony would have been admissible if taken by deposition. While on the witness stand in Brunswick he was asked by counsel for the intervening White children if he heard the testimony of Donald M. Gray which had been taken by deposition (now ruled inadmissible) earlier in the month. Dr. Marshal testified that he did hear that testimony and that he heard Donald M. Gray, Director of Personnel, testify "that in the employment of teachers a minimum grade of 400 is set for Negro teachers, 400 on National Teachers Examination, and a minimum grade for white teachers is set at 500". When asked how long that policy had been in effect, Dr. Marshal said:

"I don't know how long that has been going on."

The fact that a White applicant must make 500 on a scale of 1,000 in order to be employed in Savannah while a Negro applicant is only required to score 400 on a scale of 1,000 was thus established without dispute, without explanation. It is contended by the Justice Department that if the deposition of Dr. Gray is excluded no evidence remains in the record as to discriminatory hiring by the defendants. We do not agree. It is rather strange that the Justice Department of the United States Government should exert its powers in an effort to conceal or suppress facts as to discrimination against

White people on account of their race and color.

(5) It has been suggested that since my decision of August 23rd several decisions have been rendered by the Fifth Circuit Court of Appeals and by the Supreme Court that should result in a revision of that decision. The Court is unable to agree with that contention. Among the cases lately decided by the Court of Appeals for the Fifth Circuit is Singleton v. Jackson Municipal Separate School District, et al., 355 F.2d 865, decided on January 26, 1966. That case discusses several previous cases, including Stell v. Savannah-Chatham County Board of Education, 333 F.2d 55, and Jackson Municipal Separate School District, et al. v. Evers, 357 F.2d 653, then pending before the Court of Appeals and decided by the Court on the same day. Neither in those cases or in any other case called to the attention of the Court has the Fifth Circuit Court of Appeals, or any other court, questioned the findings of fact by this Court in *Stell* or the findings of fact by Judge Mize in *Evers*.

■ In the *Evers* case (decided January 26, 1966), the Court, citing and following Cahn, A Dangerous Myth in the School Segregation Cases, 30 N.Y.U.L. Rev. 150 (1955), held that the contention that *Brown* [v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873] was decided for sociological reasons untested in a trial was a bewitching and bewildering "myth" and that *Brown*, not having been decided on facts, may not be overturned on a contrary factual showing. It should appear quite plainly to anyone with common intelligence that nothing said by this Court on August 23rd and nothing said by this Court now in any way tends to overturn the *Brown* decision. What this Court decided on August 23rd and what this Court reiterates now is that, consistently with and in accordance with *Brown* and the decision of the Court of Appeals in this case (333 F.2d 55, 61, 62), school children may be assigned to particular schools "on a basis of intelligence, achievement or other aptitudes upon a uniformly administered program" provided race is not a factor in making the assignment.

In *Brown* it was clearly pointed out that only school children of "similar age" and the "same educational qualifications" are entitled to be grouped together in schools under the equal protection clause of the 14th Amendment. How may the age and mental qualifications of a child be determined? How may the intelligence, achievement or other aptitudes of a child be determined? Is not evidence necessary in order to make these determinations? Certainly no such determinations can be made fairly and honestly without considering evidence.

The burden of Mr. Cahn's thesis is that he and everyone else knew about the cruelty of segregation and the fact that the Court considered evidence in *Brown* was merely evidence of the merciful heart of the Supreme Court Justices. He would have courts draw upon their imagination for their facts.

Apparently Mr. Cahn was of the opinion that segregation whether by reason of race or color or by reason of intelligence and mental qualifications is "cruelty" as far as the least intelligent are concerned. See Vol. 30, page 159 (January 1955). Mr. Cahn pointed out that it is not necessary "to prove a fact that most of mankind already acknowledges, * * " and that an attempt to prove such a fact is "a rather bizarre spectacle". Mr. Cahn described the basic approach of social psychologists (such as those cited in *Brown*) to the question of segregation as "liberal and egalitarian" (p. 167). Quite appropriately, he cautions: (p. 166)

"It is predictable that lawyers and scientists retained by adversary parties will endeavor more aggressively to puncture any vulnerable or extravagant claims. Judges may learn to notice where objective science ends and advocacy begins. At present, it is still possible for the social psychologist to 'hoodwink a judge who is not over wise' without intending to do so; but successes of this kind are too costly for science to desire them."

In the New York University Law Review for January 1956, Mr. Cahn seems to make apologies for much that he said in 1955. See Volume 31, p. 182, et seq. Commenting upon the use of social psychology in law cases (p. 194), he lectured courts and cautioned against the use of the kind of psychological testimony admitted in the cases underlying *Brown*. He concluded his later article saying:

> "But there is no substitute for the vigilant exercise of critical intelligence. Where public justice is concerned, an educator has no more right to play the dupe than the deceiver."

If the words of Professor Cahn are to guide us, maybe we should swallow all of them—but slowly to see how they taste. To the effect that *Brown* was decided on *facts in the record*—not on the *imagination of judges,* see Taylor v. Board of Education of New Rochelle, 191 F.Supp. 181 (S.D.N.Y.1961); Fahr and Ojemarm, "The Use of Social and Behavioral Science Knowledge in Law", 48 Iowa L.R. 59 (1962).

We adopt the last quoted words of Professor Cahn: "there is no substitute for the vigilant exercise of critical intelligence". Where the justice and particularly the welfare and education of children is concerned, a judge has no more right to play the dupe than the deceiver.

As pointed out in my decision of August 23rd, a published study entitled "Project Talent" (1963) was tendered and admitted into evidence in this case. Since that Study investigated on a national scale the same questions that were investigated by the evidence in this case and in *Evers* and since that Study was conducted in behalf of the Office of Education, U. S. Department of Health, Education and Welfare, and since the Court of Appeals has declared that studies and findings made by the Office of Education are entitled to great weight (see Singleton v. Jackson Municipal Separate School District, 5 Cir., 355 F.2d 865, decided January 26, 1966, pp. 5 and 7), we feel justified in referring to it again. The Study involved 773 public senior high schools in every section of the United States involving some 500,000 students. That Study found the facts to be almost exactly as found by this Court in the trial on the merits and as found by Judge Mize in *Evers*. It is, therefore, appropriate to refer to such Study in more detail than was done in my decision of August 23, 1965.

"Project Talent" relates to the "educational achievement of high school pupils in relation to percentage of Negroes in school enrollment." It was conducted by the Project Talent Office of the University of Pittsburgh under the auspices of the U. S. Department of Health, Education and Welfare. George R. Burket, who was in charge of the Study, is a nationally renowned authority in his field. He did not slant or color the study so as to conform to any preconceived ideas or any national policy. (A copy of it is now on file as a part of the record in this case and is subject to inspection in the Office of the Clerk of this Court.)

The purpose of one part of the survey was to display "differences and similarities among schools having varying proportions of Negro enrollment."

The tests administered in the schools can be classified as both *aptitude* and *achievement* tests. All of these tests are highly related to school grades and hence are predictive of school learning. Scores were *not* published for individual White and Negro students. Scores were released, instead, for *classes* having proportions of Negroes running from zero to 100 per cent. Intermediate steps are 1–9 per cent Negro, 10–19 per cent Negro, 20–29 per cent Negro, and 30–99 per cent Negro.

Thus, the zero classes are *all*-White. The 100 per cent classes are *all*-Negro.

Tables incorporated in *Project Talent* are too voluminous to be fully reproduced but essential trends can be summarized as follows:

1) There is a strong tendency for average test scores to *decrease as the per* cent of Negroes increases. The fall-off holds for schools in the East, North and South and occurs in both non-verbal (that

is, *abstract-reasoning*) tests and in verbal (that is, *reading comprehension*) tests. For instance, in the 12th Grade classes of Southeastern States, results from 19 tests show drops of from 20 per cent to 80 per cent in average score from zero per cent to 100 per cent Negro enrollment. That is, the averages were 20 per cent to 80 per cent below the averages earned by all-White 12th Grade classes. The per-. centage decrease was in ratio to Negroes enrolled, the more Negroes, the lower the score.

In the mid-East, for the same tests, the drop is only slightly less, from 16 per cent to 60 per cent in the averages.

2) Little difference in test scores was found between schools in low-quality, medium-quality and high-quality housing areas. In all-Negro schools, test means were actually *higher in low-quality housing* than in medium and high-quality housing.

3) The larger the per cent of Negroes in school, the higher drop-out rate. Dropout rates were lower in the Southeast than in Eastern and Northern areas. (Note: The Southeast, the area with the *lowest* percentage of drop-outs, it is worth noting, historically has maintained segregated public-school systems.)

4) Absenteeism increased as the percentage of Negroes increased; also per-pupil expenditure. It costs more to operate an integrated school than a comparable segregated school.

To further summarize the "Project Talent" findings: Schools integrated *en masse* in all areas of the United States evidence, (a) lower academic performance, (b) more drop-outs, (c) greater incidents of absenteeism, (d) higher costs, (e) fewer graduates going to college, and (f) behavioral delinquency increased as the percentage of Negroes rises.

Without exception these unfavorable and unfortunate consequences occur in direct proportion to the number of Negroes enrolled. It is apparent that this Study was originally conceived and pro-jected as "Project Talent" in the expectation that it would vindicate the assumption of injury by segregation and repudiate the assumption of injury by integration, as was shown by proof in this case and in *Evers*. The honest, forthright and objective findings disclosed by this Study involving a half million high school students in nearly 800 high schools throughout the Nation are apparently the very reverse of that expected. Why such a study should not receive wide publicity and renown is mysterious. The Government that financed the Study has apparently concealed it. It is now said to be "out of print". An effective way to deal with stubborn or embarrassing facts is to replace them with imaginary assumptions. To the equalitarian all school children, all races and all men are equal and nothing to the contrary may be considered. Nevertheless, the equalitarian readily insists that the equalitarian holds first place among equals while all others are on a lower level.

That which was predicted or found to be true in the trial of this case and in the trial of the *Evers* case and that which was found to be true by the United States Department of Health, Education and Welfare in "Project Talent" is the same thing that was found to be true in Washington, D. C. as a result of massive integration. That fact was pointed out by a member of the Congress in *Evers*. (232 F.Supp. 241, 245)

In an effort to soften the devastating effects of massive integration, school authorities in Washington, D. C. and other cities have adopted various devices designed to enable brighter children to be classed with brighter children so that their progress rate may not be seriously impaired. In Washington and some other cities the "track system" of grouping children in accordance with ability is now under violent attack from civil-rights groups and the most sadistic equalitarians. The lead editorial of the Wall Street Journal of December 27, 1965, tells that story so well that the Court adopts

it and makes it a part of this opinion. It is as follows:

## "A PREMIUM ON DULLNESS

In the schools of Washington, D. C., and some other cities, the track system of grouping students according to ability is coming under increasing attack from civil-rights groups. The controversy strikes us as one more illustration of how snarled the whole theory of equality can get in practice.

A track system usually embraces basic, regular and honors classes or their equivalents, so that the better minds can advance faster and confront a greater educational challenge. In the nation's capital, where the school population is predominantly Negro, the rights leaders charge that the set-up cloaks anti-Negro discrimination in a garb of academic respectability. Related objections are that it is undemocratic and develops snobbery.

Now there may well be grounds for justified criticism of the track system as it has evolved in Washington and elsewhere, but the argument from discrimination is a remarkably poor one. What the critics are saying, whether they realize it or not, is that Negro children as a group are slow learners. More broadly, that all students should be taught on the basis of the lowest common denominator.

The first thing to note about that proposition is that it is anything but an exercise in equality. By coincidence, the current Columbia Teachers College Record contains some useful thoughts on the subject in the form of an article by Professor Paul Nash of Boston University; it is concerned not with the merits or demerits of any particular track system but with the general problem of equality in education.

'If a slow child,' writes Mr. Nash, 'is given a program that fully stretches and challenges him intellectually, and a bright child is given the same program, which bores and stupefies him, they do not enjoy equal opportunities.' In fact, no way of producing equality is known if that term is taken to imply that all children should somehow come out of the educational process equal.

What, then, are attainable goals of equality? Certainly equal access to the schools to the extent feasible, and fair treatment within them. Beyond that, paradoxically enough, inequalities can be reduced precisely by 'undemocratic' methods like grouping according to ability or variable standards.

As Mr. Nash explains, 'we may demand that an able student achieve a higher level of work in order to pass than a less able student. The passing grade really signifies 'performance in relation to ability', and the pass of the able student represents a higher measure of achievement than the pass of the less able student. We might defend this by arguing that the same absolute standard for all would mean that the weak students would not enjoy equal opportunities because they would be constantly penalized by failure.'

For our part, we doubt that furnishing intellectual challenges to capable pupils actually is undemocratic except in an unrealistic sense, or that it makes many snobs; those it does have that effect on would probably suffer the same affliction anyway. Far more important to recognize, it seems to us, is that several other values besides equality are involved in education and that sometimes they will be in at least apparent conflict.

One is the principle, which we believe valid, that the child should be permitted to absorb as much learning as he is able to, and this principle need not run counter to any reasonable definition of equality. Another consideration is the value of the gifted, or at any rate better than average, student to the society in the future.

Like it or not, it is evident that the future is going to require a lot of highly educated people, including many with specialized skills or talents. It will be well if the schools can give them a broad cultural background to buttress

their narrower specializations, but in any case it is no service to the nation to discriminate against the children with the best brains.

Finally, a value that can be viewed quite apart from pragmatic concerns is the quality of education itself. Generally speaking we think the quality has been improving in the wake of growing disenchantment with the permissive theories of progressive education and a return to emphasis on basic subjects and high academic standards. The track experiments are one important manifestation of that search for excellence.

Those who put an arbitrary and illusory equality ahead of excellence are, we believe, trapped in an intellectual confusion. By putting a premium on dullness they could, if their theories prevailed, set back the promising recent course of education."

That which has occurred in Washington, D. C. has been found to be true in cities throughout the United States. The facts are reported in common news media with greater frequency than ever before. Writing in the New York Times Magazine of May 2, 1965, Martin Mayer, a student of public schools and of American education, revealed and commented upon the same kind of facts evident in Washington, D. C. and that appear in the record of this case. While writing about New York, he accurately portrayed that which may be expected in Savannah if school children are integrated *en masse* on a common plane and are not classified in accordance with their intelligence and educability. In part he said:

"Public confidence in the (New York City) school system is fearfully low and dropping: White children are leaving the city public schools at a rate of 40,000 a year." (The Allen report, Mr. Mayer says, predicts a rate of 60,-000 annually).

" * * * Normal parents of any color need not be racist to refuse to send their children into classes where the tone is set by the low expectations the schools have derived from their experiences with minority 'groups' * * *" "Indeed, it is difficult to fathom the thought process of people who insist that there will be gains in the racial attitudes of Whites or (gains in) the self-image of Negroes from daily experiences which visibly proclaim that dark-skinned children are 'dumber' than pale-skinned children."

*"Not long ago, many of us felt that a large share of the Negro failure in the schools was itself the product of segregation; but almost nobody whose opinion is worth considering believes it today."* (Emphasis supplied by court)

"A year ago, for example, with a burst of publicity, New York announced the abandonment of the group IQ test, on the grounds that it was culture-biased and discriminated against Negroes. But the reading test that was substituted slots children almost exactly where they were in the abandoned IQ test—and what difference there is works against the Negroes" * * * "The real result of the acclaimed abandonment of the IQ test, then, is that Negro children in 1964–65 are more likely to be in the bottom classes of 'integrated schools' than they were in 1963–64."

"The tradition of success is almost gone—in increasing numbers, teachers and principals live with the expectation of failure and weave a safety net of excuses."

" * * * The decline will be fairly precipitous but no one will be able to mark the place where the system fell over the cliff and became a custodial institution for children who have no future."

The massive intelligence test data collected in the Savannah-Chatham County Schools is easily accessible. The Supreme Court and the Court of Appeals left the defendants free in this case to use their intelligence in applying or making use of such data. It is too late for the defendants "to weave a safety net

of excuses" for further impairing the educational opportunities of little children. It is too late "to weave a safety net of excuses" for discrimination against white applicants for teaching positions and against white teachers in their scale of pay.

No evidence has been presented to this Court to justify any conclusion or assumption that children with average I.Q.'s of 80 can be equalized with children with average I.Q.'s of 100. All of the evidence points to injury to the brighter children and psychological shock to the slower children. Those who would sacrifice or render useless the talents of a nation in a vain attempt to accomplish the impossible should be restrained by government and not encouraged.

### ORDER AND DECREE

■ (1) It is ordered that the defendants, their agents, officers, successors in office, and all persons in active concert with them, be and each such person is hereby enjoined from maintaining in the operation of the Savannah-Chatham County School System any distinctions based upon race or color, but they are enjoined and required to maintain and enforce distinctions based upon age, mental qualifications, intelligence, achievement and other aptitudes upon a uniformly administered program.

■ (2) It is specifically ordered that colored and white school teachers shall hereafter be employed in accordance with identical standards and it is specifically ordered that the employment of Negro school teachers with a minimum grade of 400 on the National Teachers Examination while requiring White applicants to have a minimum grade of 500 on the National Teachers Examination shall be immediately terminated. It is further ordered that the defendants shall, on or before May 15, 1966, abolish every rule or policy under which colored applicants for school teacher positions or colored school teachers are accorded preference over white applicants or teachers as a result of race and color.

(3) Pursuant to the decision of this Court on August 23, 1965, discrimination in favor of Negro teachers and against White teachers with greater competence, as to pay, shall be terminated on or before the beginning of the school year 1966–67. The defendants shall, on or before May 15, 1966, file with this Court a detailed plan for the non-discriminatory hiring and payment of teachers without regard to race and color and in which intelligence, experience, competence and merit shall be controlling factors in the future employment and retention of teachers. Said plan shall also recite steps taken and to be taken to correct the injustices resulting from past discrimination.

(4) All questions relating to the integration of teaching staffs are deferred for a further hearing and order after the desegregation order set forth herein is put into effect and discrimination in the employment and pay of teachers shall have been terminated.

Except as herein modified, the revised plan of desegregation submitted by the intervening White children and approved by counsel for the defendant School Board is hereby allowed and approved and it is made a part hereof.

It is further ordered that a copy of this decree with the revised plan of desegregation shall be served upon each member of the Savannah-Chatham County School Board, upon the Superintendent of Schools and upon counsel for all of the parties, and defendants shall cause a complete copy to be published in a newspaper in Savannah.

The Court retains jurisdiction of this cause to amend or modify this decree and to permit amendments or modifications of the desegregation plan adopted as a part of this decree and to issue such further orders as may be necessary or appropriate. The costs incurred in this proceeding to date are not taxed against any party.